## HASBROUCK VS. THE CITY OF MILWAUKEE.

A municipal corporation does not possess the power to engage in works of internal improvement, such as the construction of railroads, canals, harbors and the like, unless that power is specifically granted by the legislature.

The "act to authorize the mayor and common council of the city of Milwaukee to issue bonds," &c., approved April 1st, 1853, and the act of March 18th, 1856, amending the same, did not confer upon the city of Milwaukee power to construct a harbor, the expense of which should exceed $100,000 ; and a

contract for the construction of such harbor, which provided for a greater
expenditure, was void as to the excess, for want of corporate power in the
city to make such contract.

A subsequent legislative ratification of such contract was not sufficient, *proprio
vigore*, and without evidence that such ratification was procured with the as-
sent of the corporation, or had been subsequently acted upon or confirmed
by it, to make the contract obligatory upon the corporation.

APPEAL from the Circuit Court for *Milwaukee* County.

By the first section of chap. 171 of the local acts of 1853,
the mayor and common council of the city of Milwaukee
were "authorized to issue bonds of said city to an amount
not exceeding fifty thousand dollars," "to raise money to be
expended in the construction of a harbor" in that city. The
second section of the act declared that "for the purpose of
constructing such harbor, the said common council shall
[should] have the power to open a new channel from the
Milwaukee river into the deep water of Lake Michigan;"
and that "said common council shall [should] have the
power to erect, construct and maintain such docks, piers and
other works in the Milwaukee river and in Lake Michigan
as shall [should] be necessary to keep open said channel
and permit at all times a safe and convenient ingress and
egress for vessels." The fifth section made it the duty of
the council to cause accurate maps, plans, and profiles of
the proposed harbor and improvements to be made and
filed in the office of the city clerk, and to let out the
work by contract to the lowest bidder, giving reasonable
notice to invite proposals. By the sixth section it was pro-
vided, that before issuing any bonds the council should sub-
mit the question of such loan to the legal voters of the city
at an election to be called, &c., and that if a majority of the
votes given should be "for the harbor loan," then the coun-
cil should issue said bonds, and not otherwise. By an act
approved March 18, 1856, the above act was "so amended
as to increase the amount of bonds which the mayor and
common council were authorized and empowered to issue
under and by virtue of said act, to one hundred thousand
dollars in the aggregate, to be issued for the purposes speci-
fied in said act." By another act, approved February 23d,
1857, the mayor and council were authorized "to issue such

an amount of the bonds of said city as may [might] be necessary to complete the harbor" before mentioned. The present action was brought by *Hasbrouck* to recover a balance of over $73,000 alleged to be due to him from the city for labor and materials furnished in the construction of said harbor. The complaint, after alleging that the city was lawfully authorized to enter into the contracts, &c., therein set forth, stated, that in 1854 the city entered into a contract with one Hawley, by which the latter agreed to furnish the materials for and to construct a harbor entrance from Lake Michigan to the Milwaukee river, in accordance with the plans and specifications then on file in the city clerk's office, subject to any alterations which the city might direct to be made, the extra expense of which was to be paid by the city. The work was to be commenced on sections one, two and three of the harbor as designated on the plan, which were to be finished by the first of July, 1855, and if in the meantime the city had determined on constructing the fourth section, that was to be completed by the 1st of September, 1855. For the construction of the first three sections the city was to pay Hawley $48,900 in its own bonds at par; and for the construction of the fourth section, if ordered, $30,000 more in the same manner. In June, 1855, Hawley assigned the contract, with the consent of the city, to one Barton; and on the 25th of that month the city entered into an agreement with Barton, which, after reciting that Barton had taken an assignment of the contract made with Hawley, and that by a resolution of the common council, passed on that day, the city had agreed to pay Barton $10,100 in addition to the amount expressed in the contract with Hawley, as a consideration for the completion of the work defined in said contract, was in substance as follows: Barton was to construct the harbor in conformity with the contract with Hawley, subject to the alterations and stipulations therein mentioned, and was to complete the same by the 1st of August, 1856, and to receive therefor $50,000 (in city bonds) less the amount previously paid to Hawley; and if the city should alter the plan so as to increase the work, the time of completion should be extended, &c. The complaint alleged that on the 6th of

August, 1855, the city, acting on the right reserved in both of said contracts, adopted in lieu of the plan designated therein, one previously designed for the same object by the Government of the United States; that Barton, during his life, by direction of the city authorities, proceeded with the construction of the harbor upon the plan adopted by this change; that the change was a material and substantial one, and greatly enhanced the cost of constructing said harbor entrance, insomuch that the original plan could not be followed as a guide, " even to the extent of the amount of the labor and materials contemplated and estimated as sufficient for the construction of said harbor upon such original plan;" that upon the adoption of this change of plan it was understood and agreed between Barton and the city, through its officers, that all labor and materials furnished in constructing the harbor should be estimated at cash prices, and that Barton was to receive the bonds of the city no longer at par, but at their actual market value; that the labor and materials furnished by Barton were in fact estimated at their cash value; that in the early part of 1856 Barton died, leaving the harbor unfinished, and in May, 1856, his legal representative, with the consent of the city, assigned the contract to the plaintiff, who, at the special request of the city, entered, in his own name and in his own right, upon the completion of the work, upon the terms, conditions, stipulations and agreements existing between the city and said Barton as above alleged, and completed the work on the "altered and governmental plan," to the satisfaction and acceptance of the city, in November, 1856; that during the progress of the work, estimates were made from time to time by the city engineer, of the labor and materials furnished therefor by the plaintiff, at a cash valuation, and said estimates amounted to, and the labor and materials furnished by the plaintiff were of the value of $177,384,38 ; and that the plaintiff had received in part payment thereof one hundred and thirty-three bonds of said city of the nominal value of $1,000 each, but whose real net value, when received, was, in the aggregate, $103,707,50 ; leaving due to the plaintiff at the commencement of this action $73,076,83, besides interest.

The defendant demurred to the complaint, on the ground that it did not state facts sufficient to constitute a cause of action.    The circuit court sustained the demurrer, it having been stipulated by the parties that the demurrer should go simply to the right of action, and not to informal or insufficient statement.    Judgment for the defendant.

June Term,
1860.

HASBROUCK
v.
THE CITY OF
MILWAUKEE.

*Emmons*, *Van Dyke* and *Hamilton*, for plaintiff in error:

I.    The agreement with *Barton* for a price exceeding $50,000 did not render the contract with him void for want of power in the city to make the same.    1. The act of 1853 (Local Laws of 1853, p. 458,) limited the issue of bonds in the first instance to $50,000, but did not limit the ultimate expense of the harbor.    The authority conferred on the city in reference to the issue of bonds, was in the nature of an appropriation, with power to contract for a work of any dimensions or cost which might be found necessary, leaving the city to apply to the legislature for such further authority and direction as to the means of raising money as might from time to time be required.    Sec. 5 provides for "maps, plans and profiles of the proposed harbor and improvements" to be thereafter made, showing that the legislature did not intend to restrict the city to any plan, and therefore not to any price.    The acts of 1856 and 1857 also show that the legislature put this construction upon that of 1853.    2. If the acts of '56 and '57 do not show conclusively the intent of the act of '53, they are at least a legislative ratification of the contract between the city and Barton.    The effect of such statutes would not be to charge the contracting parties against their will, but to carry their intentions into effect.    On the power of the legislature to give validity to such contracts by subsequent ratification, counsel cited and commented upon *Shaw vs. Norfolk Co. R. R. Co.*, 5 Gray, 162 ; *Hall vs. Sullivan R. R. Co.*, cited in Pierce on Am. R. R. Law, 520 ; *Wilkinson vs. Leland*, 2 Peters, 627 ; *Syracuse City Bank vs. Davis*, 16 Barb. (S. C.), 188 ; *Foster vs. Essex Bank*, 16 Mass., 245 ; Sedgwick on Stat. and Con. Law, pp. 202, 298.

II.    It was not necessary to aver in the complaint that the contract was "let to the lowest bidder, giving reasonable notice to invite proposals."    1. The terms of the stipulation

(referred to in the judgment) preclude the defendant from urging this objection. 2. The averment that the city was "lawfully authorized and empowered to enter into the contracts," &c., was a sufficient averment that the conditions precedent had been performed. 3. There was no new contract with Barton. He was substituted for Hawley as contractor under the contract then existing, which the parties then modified precisely as they might have done if Hawley had retained that position. The right to make such modifications was reserved in the contract itself, and was contemplated in the advertisement for proposals. 4. Though a contractor to do work for the city was bound to take notice of the law as it affected the corporate power of the city to make the contract, he was not bound to inquire whether the city had obeyed the merely directory requirements of the law. *Commissioners of Knox Co. vs. Aspinwall*, 21 How., 539; *The Royal British Bank vs. Turquand*, 6 Ellis & Blackburn, 327; *Maclae vs. Sutherland*, 25 Eng. L. & E., 114.

*J. La Due*, City Attorney, and *H. L. Palmer*, for respondent:

A corporation can exercise no powers not expressly conferred by its charter or necessarily incident to the purposes of its creation. Especially is this true of a municipal corporation. *Mad. & W. Pl. R. Co. vs. Wat. & P. Pl. R. Co.*, 7 Wis., 59 ; Ang. & Ames on Corp., §§ 111, 256, 258, 271, 273, 391-3 ; *Bank of Augusta vs. Earle*, 13 Peters, 587; *People vs. Utica Ins. Co.*, 15 Johns., 383 ; *Bank of U. S. vs. Dandridge*, 12 Wheat., 68; *Clark vs. Farrington*, 11 Wis., 306. The power granted to the city of Milwaukee by the act of 1853, being an extraordinary one, must be strictly pursued. *Farmers' L. & T. Co. vs. Carroll*, 5 Barb., 613; Ang. & Ames on Corp., 253-255; *Dawes vs. N. R. Ins. Co.*, 7 Cow., 462; *Safford vs. Wyckoff*, 4 Hill, 447-8 ; *Head vs. The Providence Ins. Co.*, 2 Cranch, 127. The evident intent of the act was to authorize the city to incur an indebtedness for the construction of a harbor which should in no event exceed $50,000, and that the plan of the proposed improvement should be determined prior to contracting, and that the work should be let by contract to the lowest bidder. If the Hawley contract was

made in conformity with these provisions, still the change of plan, and the subsequent stipulations with Barton, were unauthorized and void. 1. The act did not authorize the council to adopt one plan, and after it was partially executed, change to another. 2. The agreement with Barton, aside from the change of plan, increased the expense of the improvement $9,000 beyond the entire expenditure contemplated by the legislature; and this amount of work was not " let to the lowest bidder," nor was reasonable notice given to invite proposals. 3. It appears from the complaint (1), That the change of plan was a material and substantial one;" that it greatly enhanced the price; and that the original plan could not be followed as a guide, even to the extent of the amount of labor and materials contemplated by it. (2.) That after this change of plan, new stipulations were entered into as to the mode of estimating the work and materials, and making payment therefor. (3.) That under this change of plan and these stipulations, the plaintiff performed labor, &c., to an amount almost four times as great as the expenditure authorized by the act of 1853. This was, therefore, substantially a new contract; new as to the *plan* and the *amount* of work, and as to the *terms* and *mode* of payment. And this new contract was not made with the " lowest bidder," nor "after reasonable notice inviting proposals." 3. The complaint does not state the amount of work done by Hawley or by Barton under the original contract, or that the city was indebted to either of them for such work at the time of the assignment of the contract to the plaintiff. If then, the plaintiff is not entitled to recover for work done under the agreement of the 25th of June, 1855, nor under the subsequent change of plan and stipulations with Barton and the plaintiff, the complaint shows no cause of action.

*By the Court*, DIXON, C. J. The power of municipal cor- porations, when authorized by the legislature, to engage in works of internal improvement, such as the building of railroads, canals, harbors and the like, or to loan their credit in aid thereof, and to defray the expenses of such improvements and make good their pledges by an exercise of the

power of taxing the persons and property of their citizens, has always been sustained on the ground that such works, although they are in general operated and controlled by private corporations, are nevertheless, by reason of the facil-ities which they afford for trade, commerce, and inter-communication between different and distant portions of the country, indispensable to the public interests and public functions. It was originally supposed that they would add, and subsequent experience has demonstrated that they have added vastly and almost immeasurably, to the general business, the commercial prosperity, and the pecuniary resources of the inhabitants of the cities, towns, villages and rural districts through which they pass, and with which they are connected. It is in view of these results, the public good thus produced, and the benefits thus conferred upon the persons and property of all the individuals composing the community, that courts have been able to pronounce them matters of public concern, for the accomplishment of which the taxing power might lawfully be called into action. It is in this sense that they are said to fall so far within the purposes for which municipal corporations are created, that such corporations may engage in, or pledge their credit for their construction. Upon no other principle can the exercise of the power of taxation for such objects be sustained. And in doing so the courts have never, to my knowledge, extended it to cases where it was not apparent that the members of the corporation concerned would be benefited by the construction of the work contemplated. The building of the harbor at Milwaukee comes clearly within this principle, and upon it there can be no doubt that so far as the corporation has acted within the limits of the authority granted by the legislature, it is bound to a strict performance of its contracts. But whilst the power of such corporations, when authorized, thus to engage in or loan their credit for the making of such improvements, has been almost invariably upheld, it has not as yet, I believe, been adjudged in any case, that they could do so without such legislative authority. No court or writer upon the subject, so far as I

know, has ever claimed or intimated that they could do so in the absence of such authority. On the other hand, the general expression of opinion has been that they are incompetent, by virtue of their ordinary powers, and without such special legislative authority, to contribute to such enterprises. Mr. Pierce, in his Treatise on American Railroad Law, recently put forth, says that no attempt on their part, without such special legislative authority, to exercise such extraordinary powers, has yet been the subject of judicial examination, and adds his opinion that it could not be sustained. In several cases which have heretofore been before this court, it has been conceded by counsel that it could not be. In this case, the counsel for the plaintiff in error expressly waived its discussion, and virtually admitted that the rights of their client must stand or fall upon the true construction of the several acts of the legislature by which the city was permitted to engage in the work. They rested the case upon the effect to be given to those acts and the action of the city under them. Its decision, therefore, depends upon the construction which they shall receive, and the several steps taken by the city in pursuance of them.

And here it will become more convenient for me to reverse the order of argument pursued at the bar, and of time in which the several acts were passed, and to examine the last position taken by the counsel for the plaintiff in error under the last act first, and in connection with it the authorities by which they seek to support it. It is said by them, that if it be conceded that under the two previous statutes the city was only authorized to enter into a contract for the construction of a harbor, the expense of which should not exceed $100,000, and that the municipal authorities were not, at the time they attempted to do so, empowered to make an agreement, or bind the corporation for the payment of a greater sum, the defect is cured by the operation of the act of February 23d, 1857 (chapter 66, Private Laws, 1857), and that from and after the passage of this act, the agreement for the excess became valid and binding upon the city. To this position counsel cite

several authorities, and as I am unable to agree with them, an examination of those authorities will become necessary. In the first place, it will be observed from what has already been said, and should be borne in mind, that the subject with which we are dealing is not one of public policy merely, but of corporate power, and that the inquiry is whether, where the supposed contract of a public corporation is absolutely void for want of capacity to enter into it, a subsequent legislative ratification or recognition of it is sufficient, *proprio vigore*, and without any evidence that such ratification or recognition was procured at the instance or with the assent of the corporation, or that the corporation has subsequently acted upon or confirmed it, to give such contract life and validity, and make it obligatory upon the corporation. Conceding that the previous statutes did not confer upon the city the power to enter into the contract, which I shall discuss hereafter, then I understand such to be the true nature of the inquiry here presented. I do not understand that the city, by any appropriate action, petitioned or asked for the passage of the act; nor is it averred that it subsequently ratified or assented to it. On the contrary, I infer from this proceeding, that it has refused to be bound by it, or the contract to which it had reference. Under these circumstances the question is, can the legislature, by recognizing the existence of a previously void contract, and authorizing its discharge by the city, or in any other way, coerce the city against its will into a performance of it, or does the law require the assent of the city as well as of the legislature in order to make the obligation binding and efficacious? I must say that, in my opinion, the latter act, as well as the former, is necessary for that purpose, and that without it the obligation cannot be enforced. A contract void for want of capacity in one or both of the contracting parties to enter into it, is as no contract; it is as if no attempt at an agreement had ever been made. And to admit that the legislature, of its own choice and against the wishes of either or both of the contracting parties, can give it life and vigor, is to admit that it is within the scope of legislative authority to divest settled rights of property, and to take the property of

one individual or corporation and transfer it to another.  It
is certainly unnecessary at this day to enter into an argu-
ment or to cite authorities to show that under a constitutional
government like ours the legislature has no such power.

It is undoubtedly true that in cases like the present, where
there is a strong moral but no legal obligation to pay, courts
often have seized, and may again seize upon very slight cir-
cumstances of assent in order to give effect to the contract.
And in this case, if it appeared that the city did by some au-
thorized action procure the passage of the act, or had subse-
quently acquiesced in it by ratifying the contract, there
would be little difficulty in the way of holding it bound by
its terms.  In such cases it is the contemporaneous or subse-
quent assent of the parties to be bound, coupled with the
power or ability on their part to give such assent, which
makes the contract obligatory.  But the giving of such as-
sent is a matter which depends upon their own free will.  It
is a voluntary act which they may do or not do as they see
fit, and in case they think proper to withhold it, the legisla-
ture has no power to compel it.  If in a transaction between
private parties, a contract made by them should be declared
void by the provisions of some statute, as for instance, a stat·
ute against usury, no one I think would insist that the legis-
lature could, without the consent of the borrower, remove
the infirmity and make the agreement obligatory upon him.
It might change the entire policy of the state upon the sub-
ject of interest, and declare that no rate however exorbitant
should avoid the security, but it could not, without the as-
sent of the parties, interfere with past transactions.  Corpo-
rations, whether public or private, are within the same rule
of protection, and I can see no substantial ground for a dis-
tinction between contracts which are void for a want of ca-
pacity in one or both of the contracting parties to enter into
them, and those which are void for some other cause.  If
the city in this instance had accepted and approved the act
of the legislature, in whole or in part, there can be little
doubt that to the extent of such acceptance and approval it
would have become bound.  The case would then have fall-
en within the principles of the case of the *City of Bridgeport*

vs. *The Housatonic Railroad Company*, 15 Conn. R., 475, where the bonds of the city issued to aid in the construction of the company's road were held valid, because the confirmatory resolution of the general assembly was afterwards accepted by the freemen of the city. It would also come within the doctrine of this court laid down in the recent case of *Mills vs. Gleason;* but until there be such acceptance I know of no authority for saying that the city is bound.

The mistake of the counsel for the plaintiff in error consists in their supposing it to be a mere question of public policy. If it were, and the court were only called upon to determine what was the policy of the state with reference to allowing municipal corporations in general, and the corporation of Milwaukee in particular, to engage in works of that kind at the time the contract was enlarged, then I would admit that their position is supported by the cases of *Shaw vs. Norfolk County Railroad Company*, 5 Gray, 162, and *Hall and others, Trustees, vs. Sullivan R. R. Co.*, U. S. Cir. Ct. for district of New Hampshire, reported in Pierce on American Railroad Law, page 520, note 1. In both these cases the question arises whether the instruments by which the railroad corporation had attempted to transfer their franchises were invalid upon grounds of public policy. It was insisted that as the franchises were created by the legislature for the public benefit, and confided to particular political persons to be exercised for that purpose, any attempt to delegate them to others was inoperative and void. In both instances the legislatures of the respective states had, by acts passed after the execution of the conveyances, referred to and recognized them as valid. In the first named case the conveyance had been directly ratified and confirmed by statute. The courts held that such acts of recognition were conclusive upon their effect, because they showed that at the time they were executed, no rule of public policy was contravened. They acknowledged the power of the legislature to determine and control the policy of the state with regard to corporations created under its authority, and looked into the acts as evidence of what that policy was *when* the transfers were made. No question of corporate power was made.

June Term,
1860.

HASBROUCK
v.
THE CITY OF
MILWAUKEE.

The policy being settled in favor of the transfers, the power to make them was conceded. But such is not the nature of the transaction before us. This is not a question of conceded power and doubtful policy at the time the plan was changed and the contract enlarged, but the reverse. We cannot, from an examination of the statute under consideration, say, as the courts there said, that it was originally the intention of the legislature that the corporation should possess the power which it has attempted to exercise. We cannot infer from it that the legislature intended at the outset that the people or corporate authorities of Milwaukee should have the power to expand the undertaking and augment its expense at their pleasure, but rather the contrary. The more natural and truthful inference is, that, in the opinion of the legislature, they had not such power, and hence the passage of the act for the purpose of enabling the city, if it chose, to do that which under the circumstances the legislature deemed to be equitable and just. The language of the act is permissive and not compulsory. It indicates no desire on the part of the legislature, even if it possessed the power, to compel the city to issue its bonds for the completion of the harbor. The legislature simply say that the mayor and common council are authorized and empowered to issue such an amount of bonds as may be necessary to complete it, in such denominations as they may deem proper, and bearing interest at a rate not exceeding seven per cent.

It furthermore sufficiently appears in both the above named cases that the railroad companies had acted under and ratified the confirmatory statutes. In the first it is distinctly stated that the company had paid a portion of the interest which had accrued upon the bonds, for the security of which the mortgage was executed, after the passage of the statute; and in the second, although there is no separate statement of the facts, and we have only such as are to be gathered from the opinion of the court, which does not profess to give them completely and accurately, still I think it is fairly to be inferred from what is said, that the company had acted under the first statute and issued new stock in pursuance of the authority there given. So that if any doubts had

arisen in those cases as to the power of the companies to mortgage their franchises, there was such evidence of their subsequent assent as would have cured the defect, and they would then have been no guide for the determination of this case.

It follows from what I have already said, that in my opin - ion this is not a defect which can be reached by the retro- active power of the legislature alone. It cannot, because in so doing the legislature would interfere with vested rights of property. It would of its own mere motion create an *obliga- tion* where by law none before existed; it would impose a liability against the will and without the consent of the party to be charged. This the legislature cannot do. It can only act retrospectively for the purpose of furnishing a remedy for, or removing an impediment in the way of the enforce- ment of some pre-existing legal or equitable right or duty, and not for the purpose of creating such right or duty. And the distinction, I think, will be found to prevail in all the cases. An examination of them will, I believe, show that such legislation has not been permitted to conclude the rights of the parties except when legal or equitable rights or obligations had grown up out of the previous lawful acts and dealings of the parties, and existed independently of the defect or irregularity complained of, and which the legisla- ture sought to cure or remove; and that no case can be found where it has been held that such legislative action alone was sufficient to give life and validity to supposed contracts or obligations which originated solely and exclu- sively in acts which it was unlawful or impossible for the parties themselves at the time to perform. Chancellor KENT, in the first volume of his Commentaries, page 455 of the or- iginal edition, in speaking of the retroactive power of the legislature in this country, sums up the doctrine very clear- ly and accurately. He says: "A retrospective statute, affecting and changing vested rights, is very generally con- sidered in this country as founded on unconstitutional prin- ciples, and consequently inoperative and void. But this doctrine is not understood to apply to remedial statutes, which may be of a retrospective nature, provided they do

not impair contracts, or disturb absolute vested rights, *and* <span>June Term, 1860.</span>
*only go to confirm rights already existing, and in furtherance of*
*the remedy, by curing defects and adding to the means of enforc-* Hasbrouck
*ing existing obligations.*   Such statutes have been held valid The City of
when clearly just and reasonable, and conducive to the gen- Milwaukee.
eral welfare, even though they might operate in a degree
upon existing rights, as a statute to confirm former mar-
riages defectively celebrated, or a sale of lands defectively
made or acknowledged.   The legal rights affected in those
cases by the statutes, *were deemed to have vested subject to the*
*equity existing against them,* and which the statutes recognized
and enforced.   But the cases cannot be extended beyond
the circumstances on which they repose, without putting in
jeopardy the energy and safety of the general principle."
In this case it is impossible to say that by virtue of the sup-
posed contract the plaintiff did or could obtain any vested
rights as against the city, beyond the $100,000 which it was
previously authorized to expend in the building of the har-
bor, for the reason that it was not in the power of the people
or the corporate authorities, by any action which they could
take, to lay the foundation for such rights.   If the city had
possessed the general authority to build the harbor without
regard to the expense, but had failed through some tech-
nical error or mistake to exercise that authority in the
manner prescribed by law, the case might then have fallen
within the remedial power of the legislature, but now it
does not, unless the city assents to it.

The authorities cited by the counsel for the plaintiff in
error, and which may be supposed to be the strongest that
can be found in support of their position, will sufficiently
illustrate this rule.   In *Wilkinson vs. Leland,* 2 Peters, 627,
the executrix appointed under a will which had been ad-
mitted to probate in the state of New Hampshire, under
an order of the probate court of that state, sold and convey-
ed some real estate which had belonged to the testator, situ-
ated in the state of Rhode Island, for the payment of debts.
The estate of the testator was represented to be insolvent,
and was in fact nearly so, there being only some £15 left for
distribution after appropriating the proceeds of all his ef-

fects, including the price of the land in question, to the payment of the debts due from him, and deducting the expenses of administration. It was conceded that the probate court of New Hampshire had no power to direct the sale of lands in another state, and that the sale and conveyance were consequently inoperative and void. The legislature of Rhode Island subsequently, on the petition of the executrix, ratified and confirmed the deed. The funds realized were applied by her in discharge of the demands of the creditors. There was no pretense that the sale was unfair, or that any part of the transaction was characterized by fraud or bad faith. The supreme court held that the act of ratification rendered the conveyance operative and effectual. In doing so, the court make the decision turn mainly upon the fact, that by the laws of Rhode Island, as of all the New England states, the real estate of testators and intestates stands chargeable with the payment of their debts, upon a deficiency of assets of personal estate, and although at law the title is said to vest in the heir or devisee immediately on the death of the ancestor or testator, yet it does so only conditionally and subject to the liens or claims of creditors, for the satisfaction of which it is liable to be divested and sold. It is only the interest which is left after payment of the debts that goes to the heir or devisee. The court considered the estate or its proceeds as belonging to the creditors, for whose benefit it was liable in law to be sold and conveyed. Their rights were pre-existing and legal, and the act of confirmation, as well as the sale and conveyance, were purely remedial in their nature; they aided in the enforcement of existing obligations, in giving the creditors what justly already belonged to them. It is very evident from the opinion that if there had been no creditors, and therefore no pre-existing rights, the conclusion of the court must have been quite different. The sale and conveyance, at the time they were made, were not unlawful, improper or impossible in themselves. The defect consisted only in the *manner* in which they were made and executed.

The case of the *Syracuse City Bank vs. Davis*, 16 Barbour, 188, is similar in its character. The bank lacked nothing of

the *substance* of a good institution of the kind. It had a sound capital and had practically performed all the duties which pertained to it, but a mistake had occurred in the form of the proof and acknowledgment of a part of the subscribers to the certificate. The objection was entirely technical in its nature, and did not go to any of the substantial requirements of the law. It was a bank *de facto*, and the act which it had done was not beyond the legitimate scope or powers of such a corporation. It was not the case of a bank attempting to do that which at the time no bank could do. The removal of the obstruction was therefore a remedial act which aided in the enforcement of a just and equitable obligation to which there was otherwise no legal objection. Possessing all the essential qualities of a perfect institution, and the transaction being lawful, its contract was not a nullity, so that with the aid of the legislature it could not be enforced. It was regarded so far a complete corporation as to have the capacity of acquiring vested rights, though owing to a technical irregularity there was an impediment in the way of applying the remedy, which the legislature proceeded to displace. The act did not profess to create a new corporation, but to remedy the defects in the organization of one which already existed. In the present case, if the statute is to be held to have any beneficial effect whatever, it must be because it gave to the city a power or capacity beyond what it before possessed. For if, as was contended by counsel, it had by the previous acts the authority to. enter into a contract for the completion of the entire harbor on the plan last adopted and without limitation as to price, then the act was nugatory and useless. For then it would have had the power to issue its bonds or any other evidence of indebtedness, without the assistance of this statute. Such power would have flowed from its ability to contract, and it needed not the action of the legislature to enable it to adjust or settle its liabilities in such form as the municipal authorities saw fit to adopt. See *Mills . vs. Gleason, supra*, and *Ketchum vs. The City of Buffalo*, and the authorities there cited in the opinion of WRIGHT, J. The statute therefore does not operate in this case as it did in that, remedially. It was there

designed to cure a defective exercise of the power to organ-
ize a bank, a power which already existed. Here it was not
intended to help out the operation of an existing power, but
to confer one which the corporation did not before possess.
The distinction is between aiding the imperfect execution of
an authority previously granted or act lawful in itself, and
the granting of a new authority or attempting to relieve
against an unlawful act.

It requires no effort to distinguish between this case and
that of *Foster vs. The Essex Bank*, 16 Mass., 245. There the
statute was clearly remedial. It provided generally that all
corporations then existing or thereafter to be established,
whose powers should expire at a given time, should be con-
tinued in existence as bodies corporate for three years after
the time limited by their charters, for the purpose of suing
and being sued, settling and closing their concerns, and divi-
ding their capital stock; but not for continuing the business
for which they were established. It is very evident that the
object of the act was to save and continue the remedy upon
existing obligations and not to create new ones. The same
reasoning will apply to cases of marriages defectively cele-
brated, judgments entered on the wrong day, (10 Serg. &
Rawle, 101), deeds defectively acknowledged, (16 id., 35),
or remedies given where by law none before existed, (7
Watts, 300).

I therefore think that this action cannot be maintained
unless, as was contended by counsel, the city had the power
to enter into and bind itself by the contract under the pro-
visions of the previous acts. If it had, then it may; for the
contract was made and the work completed after their pas-
sage, but before the enactment of that which I have been
considering.

I have already noticed that if by the previous acts, au-
thority was delegated to the city to complete the harbor in
the manner in which it has been done, then the last act was
wholly nugatory and useless. It would be so except so far as
it might be considered as a legislative interpretation of the
former acts, and in that respect it would make against the
construction contended for by the counsel for the plaintiff in

error. It shows most indubitably that in the opinion of the legislature the city was limited by them to an expenditure of $100,000. This I cannot for a moment doubt is the true construction of those acts. It is manifest to me from their entire scope and tenor, and the language used, particularly in the first, (chapter 171, Laws of 1853), under which the enlarged power is claimed, that such was the intention of the legislature. Its language is restrictive. The mayor and common council were authorized to issue bonds of the city to an amount *not exceeding fifty thousand dollars.* The regulations to be observed and steps to be taken before the bonds could be issued, clearly indicate it. The assent of a majority of the legal voters was first to be obtained. Before issuing any bonds the common council were required to submit the question of such loan to the legal voters of the city at an election to be called for that purpose, of which at least ten days' notice was to be given, and at which election the votes should be by ballot, which should have written or printed thereon the words "for the harbor loan," or the words "against the harbor loan;" and if a majority of the votes cast on that subject should be "for the harbor loan," the common council should issue the bonds, but not otherwise. Why were these restrictive words used, and the authority of the mayor and council thus circumscribed, if the legislature intended, by making it their duty "to let out the work by contract to the lowest bidder," to abrogate the limitation and to give them authority to bind the city to any extent they saw fit? Was it not the intention to make the power to contract subservient to the general restriction previously imposed? It seems to me clear that such was the object in view. Such construction is alone in harmony with the rule that we are so to construe statutes as that all may stand and no part be defeated. It is consistent with the latter provision and gives it the effect which the legislature intended, whilst the opposite construction would frustrate and render inoperative their will as plainly expressed in the former. This interpretation is strengthened by sec. 3 of article XI of the constitution, which makes it the duty of the legislature to restrict cities and villages in their power of taxation, as-

sessment, borrowing money, contracting debts and loaning their credit, so as to prevent abuses in assessment and taxation and in contracting debts by such corporations. In imposing this restriction when the city was about to engage in such an enterprise, the legislature performed a plain constitutional duty. And in doing so what more unambiguous or less doubtful method could they have adopted than that of fixing the sum which the city might expend? Clearly none. Again, why submit the question to the will of the voters, if such submission was to have the effect of authorizing the municipal authorities to incur an indebtedness many times larger than that upon which they were called upon to express their opinion? Was it the intention to deceive and trick upon them liabilities and burdens of which they had not the slightest intimation? Evidently the legislature had no such design, but the intention was to allow the city to loan its credit to that amount, provided a majority of the voters gave their consent, otherwise not at all. With a majority vote against the loan, the provision in relation to letting the contracts would have remained a dead letter upon the statute book.

I need not spend time upon the act of March 18th, 1856, (chapter 145, Private Laws, 1856.) It simply authorized an increase of the amount of the bonds to $100,000. No other effect was claimed for it.

I do not discuss the questions growing out of the alleged irregularities in the reletting or subsequent enlargement of the contract. The city having already exceeded the limits fixed by the two first acts, by issuing its bonds to a greater amount than they authorized, and there being no averment in the complaint that it has assented to or ratified the last, those questions become immaterial. In my judgment the judgment of the circuit court should be affirmed.

Judgment affirmed.