## SPAULDING *v.* ANDOVER.

By authority of the laws of 1870, ch. 12, and laws of 1871, ch. 3, the state issued bonds, a portion of which were assigned to the town of A., "to be devoted exclusively toward the reimbursement of the expenditures incurred by the town for war purposes during the rebellion," upon the basis that the amount of such bonds should be the aggregate of $100 for every man furnished by said town for the military service of the United States after a specified time. *Held,* (1) the assignment of these bonds was an unqualified and unincumbered grant of the same to the town, possessing all the incidents of an executed and irrevocable con-

tract; (2) the act of July 3, 1872 (laws of 1872, ch. 26), declaring a portion of the fund which had been thus assigned to the town of A. to "belong to and be the property of" certain individuals (those, namely, who, having been counted as part of the quota of the town, never received any bounty from the town), is invalid, because contrary to that provision of the Federal Constitution, art. 1, sec. 10, which declares that no state shall pass any law impairing the obligation of contracts.

ASSUMPSIT, by Charles W. Spaulding against the town of Andover, for money had and received. The plaintiff in his specification claimed to recover $100 cash, and interest thereon from January 1, 1871, or a bond for $100, issued by the state of New Hampshire, for that sum, and interest thereon from January 1, 1871. Plea, the general issue.

The defendants objected to the last part of the specification because it did not conform to the declaration, and because a bond could not be recovered in this action. The court (SARGENT, C. J.) overruled this objection, and the defendants excepted.

This suit was brought under the provisions of chapter 12 of the laws of 1870, and chapter 3 of the laws of 1871, and chapter 26 of the laws of 1872. It appeared from the report of the commissioners that the plaintiff enlisted in Co. I, 4th Reg't of reënlisted veterans, from the town of Andover, December 25, 1863, for three years, and that he was duly accepted by the United States for that time, and was duly allowed accordingly upon the quota of said town, and that the said commissioners had allowed to said town the sum of one hundred dollars, to be paid by the state to said town on account of said plaintiff's enlistment and acceptance as aforesaid, and that said commissioners had awarded to said town, in the whole, under said acts, the sum of $9,091.67. The report of said commissioners was dated January 25, 1872. Bonds had been issued under said acts, in accordance with said report. * * It appeared that there had been an assignment of bonds, according to the report of the commissioners, to each town in the state, and that most of these towns had taken and receipted for their proportion of said bonds, according to said assignment, before June, 1872, and that, on June 1, 1872, the small balance of bonds remaining in the state treasury were reported as a liability of the state, and as due to the several towns which had not taken and receipted for their bonds. The town of Andover had not actually taken or receipted for their share of the bonds which had been thus assigned to said town, and no bonds or money have actually been taken from the state treasury by said town, but they were held by the state treasurer ready to be delivered to the town whenever the town would receipt therefor and comply with the provisions of the law.

There was no evidence tending to show that any demand had been made on the defendants prior to the commencement of the action. The defendants claimed that the suit could not be maintained without a demand before the service of the writ; but the court ruled otherwise, and the defendants excepted.

The court ruled, *pro forma*, that the town had received the bonds or money from the state, within the meaning and intent of the statute of 1872, prior to June 1, 1872; to which ruling the defendants excepted.

The court also ruled, *pro forma*, that, even if the defendant town had thus received their bonds, the plaintiff could not recover, upon the ground that the act of 1872 could not apply to this case if the town had received the money or bonds before its passage; and, if the town had not received the bonds or money when this suit was brought, that then the suit could not be maintained;—to which rulings the plaintiff excepted.

It was admitted that, if the town had not received the money or bonds from the state before the first day of June, 1872, then they had not received them at the date of the writ.   Verdict for the defendants.

The questions of law thus raised by the case were reserved.

This was a test case, and was one of those which came before this court at the December term, 1872, by an agreed case,—*Ira W. Morrison and six others* v. *The Town of Andover*.   The main questions in this case, with others, were elaborately argued by the same counsel in *Morrison & a.* v. *Andover*.

*Barnard & Sanborn*, for the plaintiff.

The *pro forma* ruling of the court was, if the town had received the money or bonds before the passage of the act of 1872, which the court ruled they had, then the plaintiff could not recover; also, if the town had not received the bonds or money when the suit was brought, that then the suit could not be maintained.   The first part of the ruling is based upon an assumption of the unconstitutionality of the act of 1872, and of course also the further act of June 27, P. L., ch. 6.

The state clearly intended, by its legislation, that its munificence should not, as between the town that received it and the soldier on whose account it is furnished, go to the town, when such soldier has not received any bounty from the town; for the whole idea as embraced in the statutes is, to reimburse the town,—that is, to pay back to them in part what they have paid for individual bounties; and where nothing has been paid, there is nothing to pay back.   The legislation covers three years in time, and as many different acts, yet, being of the same kind, is to be taken together as if it was one law.   *Hayes* v. *Hanson*, 12 N. H. 290, and authorities; *Sloan* v. *Bryant*, 28 N. H. 71; *Robinson* v. *Tuttle*, 37 N. H. 248.   That construction of statutes will be adopted whenever they can be so construed as to avoid conflict with the constitution and carry out the object and intention of the legislature.   *Jones* v. *Gibson*, 1 N. H. 272; *Barker* v. *Warren*, 46 N. H. 124; Cooley on Const. Lim., ch. 6, pp. 159, 188.

Keeping in mind the well settled principles which should govern the investigation, let us examine the law and the facts as they bear upon the case at bar.   The case finds that the town of Andover had been

awarded by the report of the commissioners, dated January 25, 1872, the sum of $9,091.67, and bonds had been issued and assigned to the town in accordance with the report, although the town had not actually taken from the treasurer or receipted for their share which had been thus assigned. Each town received by law such a portion of the bonds, issued under the acts of 1870, ch. 12, and 1871, ch. 3, as they were entitled to receive, by the report of the commissioners appointed to determine the same, precisely as they would if the legislature had given them so many horses or acres of land, to be taken into possession when certain formalities were complied with; and although the bonds remained in the hands of the state treasurer, they yet in a qualified sense became the property of the town;—not immediately, for the town was not entitled to their actual possession and custody until the appointment of an agent to receive them, nor until certain evidences of the indebtedness of the town were surrendered; not absolutely, because reasonable rules and regulations might be required as to the time they should be kept, and as to their disposition and sale in the market. Moreover, if the public good required it, the bonds were to be sold by the treasurer of the state, and the proceeds only paid over to the town originally entitled to receive them; yet, with these and perhaps other qualifications, the law gave each town their quota. Neither the bonds nor the proceeds thereof could be diverted to another channel, for, by the first section of the act of 1870, they were to be devoted exclusively towards the reimbursement of the expenditures of the town for war purposes. In addition to this qualified ownership, which is somewhat like that of a *cestui que trust*, the statute contemplated a time when, by the appointment of an agent, furnishing evidence of indebtedness, and complying with any other reasonable regulations which might be made, the town should, as mentioned in sec. 3 of the act of 1871, elect actually to receive the bonds or money into their own absolute possession, and, as provided in the second section of the same act, the quota should actually be paid over to said town. This seems to be a reasonable view to be taken of the provisions of the law upon the subject, which at best are incongruous in character and obscure in meaning. It may well be said, on these facts, that the town had, within the meaning of the act of 1872, received the bonds, and, though not in actual possession of them, they were really their property. They might by any proper act refuse to take them, but they never had; and, in the absence of any such act, it will be presumed that, from the time of the publication of the commissioners' report, the town accepted of this amount, and intended to make their qualified title absolute. It is like a grant to an individual, which being clearly for his benefit, his assent will be presumed. *Peavey* v. *Tilton,* 18 N. H. 152. The fact, also, that the state treasurer, in June, 1872, reported the balance of the bonds remaining as a liability of the state, can mean no more than that the state assumed the responsibility of a bailee, as the bonds from the outset were to be appropriated exclusively to reimburse the towns, and hence were not to be mingled with other assets in the treasurer's hands, as they have not been.

Now, by the act of 1872, and while the state thus held the bonds, a further provision was made as to such a part of the specific sum or bonds awarded to the different towns as arose by reason of the services of any individual who had not received from such town any bounty; and it is in relation to this act that the constitutional test is applied.

After a town have elected to receive into their own possession the money or bonds which were awarded to them, and complied with the provision of the law necessary to that end by appointing their agent and surrendering their evidence of indebtedness and receipting to the treasurer, and, to the extent of the amount received, cancelling their claim upon the state, and mingled the proceeds so far received, whether of bonds or money, with other property of the town, or appropriated it for the uses of the town, it may be doubted if the legislature, by any act of their own, can recall to their own treasury such money or bonds, or the proceeds of the same, or divert them in any way from the treasury of the town; but until there is such an election on the part of the town, and until the money or bonds are actually paid over by the state treasurer, there is no good reason why the legislative will, as expressed in the act of 1872, based upon such manifestly equitable considerations, should not be carried out. The wisdom of the laws of 1872 and 1873 is apparent; for, if any of the brave living or honored dead ever had cause to complain of unjust discrimination in legislation growing out of the war, the plaintiff, if the construction claimed by the defendants should prevail, may well consider himself of that number; for those who enlisted early, whose patriotism was never tarnished by municipal bounties, and, after a faithful service of three years, the period of enlistment, reënlisted as veterans, under the promise from the town, which was made only to be broken, that the amount then paid to others in bounties should be appropriated for their widowed mothers and dependent sisters, who now see a construction given to the statutes which reimburses to their town one hundred dollars which they never paid, and for services which they more than discouraged, may well use the words of irony put in the mouth of Kent when expostulating with his faithless king:

> " Do :
> Kill thy physician, and the fee bestow
> Upon the foul disease."

The strongest view which can be taken of the case for the defendant town is, that the funds were the property of the town as a corporation, and as such cannot be taken from the town under the act of 1872 and given to the plaintiff. But the town is a public corporation, created purely for public purposes, and invested only with such powers as are necessary to answer the purposes of its creation. Would it be claimed that the legislature have not power to divide a town whether they are willing or not, and unite the parts thus severed to adjoining towns, and divide the property of the town, including their bonds received from the state, into equal or unequal parts, and give them in such portions as they please to such adjoining towns,—as in the division of Sanbornton and creating the town of Tilton? It is difficult to distinguish in principle

between the right to dispose of the funds of a town in such a manner, from what is done, as claimed by the plaintiff, by the act of 1872, or from setting off a school district from Andover to Franklin, and giving to the latter town one tenth of the amount awarded to Andover by the state—a power which no one would assume to question. This question was amply discussed in the briefs in *Bristol* v. *New Chester*, 3 N. H. 524;—see, also, *Berlin* v. *Gorham*, 34 N. H. 275 ; *Londonderry* v. *Derry*, 8 N. H. 320.

I apprehend the true doctrine on this point to be as stated in Cooley's Const. Lim., ch. 4, p. 277. Property of municipal corporations, " so far as it has been derived from the state, or obtained by the exercise of the ordinary powers of government, must be held subject to control by the state, but under the restriction that it is not to be appropriated to uses foreign to those for which it has been acquired." *East Hartford* v. *Hartford Bridge Co.*, 10 How. 533 ; *People* v. *Power*, 25 Ill. 190 ; *State of Maryland* v. *Baltimore & Ohio Railroad*, 3 How. 551. The application of a revenue raised by taxation, when collected, is in the control of the legislature. *Coles* v. *Madison Co.*, Breese (Ill.) 154 ; *Borough of Dunmore's Appeal*, 52 Pa. St. 374 ; *Richland County* v. *Lawrence County*, 12 Ill. 1.

Taking all the acts of the legislature before referred to touching the reimbursements to towns, and it is very clear that they provide a fund for reimbursement for money paid, and also a trust fund for the benefit of certain soldiers, making the towns for that purpose trustees. The soldiers are only to receive it through the towns. If the provisions in favor of the individual had been incorporated into the first act, no one could have raised a question as to the constitutionality of the provision. I claim that, so long as the fund is kept intact and can be identified in law, coming as it does from the state, it is the proper subject of legislation.

Again: the object of this fund from the outset was, to pay back to the towns in part what had been paid for bounties ; and when the fact appears, that an individual, on whose account the funds in part were received, has received nothing from the town, on the principles of common justice, which neither courts nor legislatures can disregard, the funds *pro tanto* should go to the individual. It is in principle very much like a failure of consideration for the promise of a note, and should not stand in the way of justice and fair dealing between the parties.

*Shirley* (with whom were *Marshall & Chase*), for the defendants.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

3. Notwithstanding they were in fact the property and constructively in the possession of the town, the plaintiff cannot recover unless the bonds were " actually " " paid out," " delivered," " received "—taken from the state treasury by the town.

The act of July 2, 1870, provided for the issue of ⁴ bonds of a specific description ; that these " bonds or their proceeds shall be devoted exclusively toward the reimbursement of the expenditures incurred by

the cities, towns," &c.; and established a plain and distinct rule for fixing the amount due to each town. It also provided that the " commissioners "—to be appointed for that purpose—" shall determine the amount to which each city, town, &c., is entitled," and that " the same shall be in part payment for any claim upon the state on account of its war debts by any such city, town," &c.

It is too plain for argument that the word " claim " does not refer to any proceeding by a town under this act. There is no provision that any town may institute any proceeding. The commission were invested with full power to proceed upon their own motion, not in consequence of any action taken or omitted on the part of towns. It was made their duty to determine. They could not escape that duty, whether the town moved, or failed so to do. Having had some experience before the tribunal created under this and the subsequent act, it may not be out of place for me to say that I have yet to learn that any town ever presented any claim. The commissioners took the initiative, and made out a list of names, service, &c.,—a credit list for each town,—themselves, and then, if another town claimed any man on that list, they notified the selectmen, agent, or some man they knew in such town, to come in and look over the list, and furnish information as to what the facts were. The word claim referred to the equitable claim which towns were assumed to have against the state for what they had done during the war. To pay a part of this equitable claim, a rule was given by the act, and a board was created to fix the share of each town under that rule.

When this was done, we take it to be clear, under the original act, that the town had a " vested right " in the amount found due, and the state treasurer might have been compelled by mandamus to pay it over—to deliver the bonds to the town. The property had become absolutely the property of the town upon the determination of the board.

The act of July 15, 1871, does not in any way undertake to modify the " foundation idea "—the prime purpose—of the former act. It is a mere confirmation of it. It has no repealing clause. It claims to be not an amendment, but an " addition " to the former act. The " addition " is in no instance a change in the principle, but an amplification of details; and these consist chiefly of a bundle of directions to the clerks of the treasurer and the commission. This act treats the amount fixed by the commission as a sum " due " the town. The " bonds " or " certificates," which is according to the French system, are to be issued " for the purpose of meeting the payments," &c., " of the act to which this is in addition"—see sec. 1; and it is made the duty of the treasurer, " whenever the quota of each and every city, town," &c., " as ascertained by the commissioners," " shall be ready for payment," " and  *  *   shall be actually paid  *  *   to such cities, towns," &c., " as may be entitled to receive the same," to make due record of the facts.

The bonds or the proceeds, when the quotas were " ascertained " by

the commissioners, became at once " the property of the town," and were held by the. state in trust for the benefit of their taxpayers. They are constructively in the possession of the town, but they have not been " actually paid ;" they have not been actually " paid out and delivered" to the town ; they have not been in fact " received" by the town.

Though clumsily framed, the first part of section 3 refers alone to bonds. If the town elect to take bonds instead of money, and the governor and council consent thereto, they may attach to their consent certain regulations over the taker's power of disposition. But if they shall " finally " refuse to give such consent, if they find " that the public good shall require their sale," then the act gives them full power to disregard such election, and order them all to be sold ; and in that case the act provides that " the proceeds thereof" " shall," not may, if the town so elect, " be applied to the credits of the several cities, towns," &c., " according to their several quotas, and in full discharge and satisfaction thereof."

The act is imperative. " Payment" must be made. Payment of what ? Payment of a sum fixed by the commissioners, and which was fixed, when they " ascertained " it, by putting it in writing—making their report.

When the act of July 3, 1872, says that the plaintiff may recover " if" the " town," &c., " has received or shall receive," &c., it uses those terms in the sense in which they are used in section 2 of the act of July 15, 1871. It means, that when the state have in fact " actually paid," " paid out and delivered," the bonds from the treasury to the town, a suit may be maintained, and not otherwise. It stands as if the word " actually" was inserted before the word " received" and " receive." Any other construction robs the words " has received or shall receive " of all meaning. The words are worse than superfluous if the act means that an enlisted man may recover whenever or because the commissioners have made an award to a town on account of his enlistment. If the town were liable in that event, the act would have said so, and it was unnecessary and at war with common sense to say, " If any city or town has received " the bonds, &c.

The history of the act shows that there is no answer to this position. Several suits of assumpsit for money had and received had been brought against a certain town in Rockingham county, that had in fact taken the bonds. The clause in question is in the handwriting of the counsel for the plaintiff in those suits. The act was framed primarily by him to legalize those suits. The other clause, " shall receive," was inserted to smooth the path and take away the odor of such " special legislation." The whole purpose was to change the property from the town to the individual, when the town had in fact taken them into their own possession. Another clause shows this very clearly. The act did not assume to change the property in all cases. When the " person " " counted as part of the quota " had received,—that is, had actually been paid,—a bounty, the bonds, &c., could not be recovered of the town.

If he had received a bounty he had no claim, and he had none, unless the town had received one for him, if he had not received one. To recover, he must show both that he had not taken a bounty, and that the town actually had on his account.

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

The case raises the general question, whether a town, which never had any contract, arrangement, or understanding with one who was counted on her quota, can be compelled, constitutionally, to pay him a bounty, after all the facts have become history, in an action of contract; and if so, the special question, whether it can be compelled to do so when it was largely in excess of its quota at the time of the enlistments. The purpose of the original act was clearly to give towns money, not to compel them to give away money to any one.

We say this most anomalous and discreditable piece of legislation has no warrant in the constitution, for the following reasons, among others:

1. This statute is judicial, not legislative, in its nature. It is in essence an order from a legislative body to a court, that when three facts,—all in the past,—appear, the court shall decree a contract between the parties, and amerce the defendant in damages fixed by that legislative decree. If the legislature can decide one branch of private disputes " between or concerning persons," it may another, and so swallow up the whole judicial power. The judicial power passes on what is past; the legislative makes new rules for the future.

2. It is retrospective : all the facts were of the past—mere matters of history. It subjects " a party to the payment of damages, or to other loss or detriment, upon considerations entirely past." *Merrill* v. *Sherburne*, 1 N. H. 204; *Clark* v. *Clark*, 10 N. H. 387.

3. The legislature have no power to make contracts between parties.

This is an action of contract. Statutory italics make it so. When mentality exists, there can be no contract unless the minds of the parties meet. Here, the case in terms excludes all idea of any contract, tacit or otherwise. The legislature cannot override parties, and make contracts for them, without or against their will. Here, they have not only attempted to make a contract where there is no pretence that any existed, but have undertaken to create out of a past act—services paid for—a present consideration, to support it. The constitution has neither directly nor indirectly given the legislature any power to manufacture considerations out of history, or to make promises for anybody. " Such a result is beyond the power of the legislature "—Smith, J., in *White Mts. R. R.* v. *White Mts. (N. H.) R. R.*, 50 N. H. 56; " and there was no power in the state capable of making for these parties a contract which they had not made for themselves "—Doe, J., in *Northern Railroad* v. *Concord Railroad*, 50 N. H. 180, 181.

We suppose it will be conceded, upon the facts stated in the case, that if this were a suit by an individual or individuals against an individual or individuals, these principles would be decisive for the defence. Can it change the principles or their application, that, while the plaintiff is

an individual, the defendants, besides being individuals, are clothed with certain municipal powers ?

What provision in the constitution authorizes the legislature to exercise judicial powers in town cases, but not in others ?  Where is their authority to create retrospective or other contracts between a town and an individual ?

If such a theory is well founded, we have no occasion for courts in the cases of municipalities.  A Turkish cadi, enforcing his decrees with the bastinado, would be the appropriate officer to exercise despotic power in such cases.  Precedents are necessarily wanting, for we are not aware that any state in the Union has ever passed an act like the one in question.  In Pennsylvania an attempt was made to give some of their bounty statutes a construction akin to that set up by the plaintiff; but the courts, in the darkest hour of the war, when our fundamental laws became as molten wax, held the statutes permissive, and thus avoided what they termed a grave constitutional question; and if such acts had been passed, the provisions of the constitutions in the different states, with few exceptions, are so unlike our own, that they could hardly be considered authority here.  Many of these constitutions either contain a grant in general terms of all legislative powers, or with a prohibition in a few specified instances.  Ours is based on another model.  Taken together, it gives more power to the court, and less to the law-making power, than any other (with perhaps three exceptions), up to the creation, within the last six years, of bundles of experiments dignified by the name of constitutions.

4. Our grants are in terms, and, from their nature, of limited and restricted powers.  Opinion of the Justices, 4 N. H. 566–572; *East Kingston* v. *Towle*, 48 N. H. 59, 60.  That this statute cannot be supported under the so-called " police power " admits of no doubt.  *Pierce* v. *The State*, 13 N. H. 578.  It cannot be sustained as the grant of a pension,—first, because it is not in the nature of a pension ; and, secondly, because if it were the state have no power to pension the soldiers of the general government, that power being necessarily exclusive in the federal government.

The taxing power does not warrant it, for, although that power is very broad and elastic, it is not unlimited.  It must be exercised for public, not private purposes.  " But taxes to meet the plaintiff's claims would be taxes for a private purpose—for a gift to an individual.  The constitution gives no authority to raise money to give away—58 Me. 591 : if it did, all protection to property would cease."  *Perkins* v. *Milford*, 59 Me. 318.

It is self-evident that the intent of this statute was, to compel towns to give away money to individuals.  Towns own town farms, stock, and stocks in railway and other corporations.  The case, in our view upon this point, stands as it would if the statute, upon the facts stated, had provided that the horses, cattle, town farm, stocks, or other property of the town, should " belong to and be the property of" the plaintiff, " and may be recovered of such town or city in an action of *assumpsit*

as for money had and received." This new form of confiscation is so clearly invalid, if based upon the taxing power, that we cannot believe that the eminent counsel, who are understood to have engineered this bill through the mazes of legislation, ever placed it or supposed that it could rest upon that ground. It would seem tolerably clear that, if the legislature could not assess a tax in order to give the money away, as in this case, they could not compel the town to do what they could not do themselves. The stream cannot rise higher than the fountain.

But there are, as it seems to us, other insuperable objections to a recovery in this suit.

The legislature not only have no power to pass laws " repugnant to or contrary to this constitution " in other respects, but they have no power to pass any statute which this court upon its conscience shall adjudge to be not " reasonable." In this state, no statute contrary to reason can be held constitutional. If they believe an act unreasonable, and fail so to declare it, the judges are unworthy of the great trusts committed by the fundamental law to their keeping. The duty may not be a desirable one, but the solemn duty of the court is, to turn neither to the right hand nor to the left. If the function seems to some extent like that of a tribunal of censors, the answer still must be, that the supreme law has imposed this paramount duty upon the judges, and they are not at liberty to disregard if they would. Whenever it became necessary to do so, this court has never failed to exercise this high function, nor to set aside laws which were unreasonable. Opinion of the Justices, 4 N. H. 566–569; *Davis* v. *School District*, 44 N. H. 404; *East Kingston* v. *Towle*, 48 N. H. 59–63.

The gravity of one cause may be greater and the consequences more far-reaching than in another, but in other respects the duty is the same imposed upon this and all other common law courts for centuries. Corporations, municipal and otherwise, may establish " reasonable " by-laws and regulations. " Members of corporations are not bound to perform by-laws unless they are reasonable, and the reasonableness of them is examinable by the judges." *Frameknitters* v. *Green*, 1 Ld. Raym. 114; *Norris* v. *Staps*, Hobart 210, *b ; Feltmakers* v. *Davis*, 1 Bos. & P. 100; *Rex* v. *Spencer*, 3 Burr. 1839; *London* v. *Vanacker*, 1 Ld. Raym. 500; *Commonwealth* v. *Robertson*, 5 Cush. 438–442; *Pedrick* v. *Bailey*, 12 Gray 162; *State* v. *Freeman*, 38 N. H. 428; *Johnson* v. *Concord Railroad*, 46 N. H. 213; *Chilton* v. *Railway Co.*, 16 Mees. & Wels. 212–231.

The constitution prohibits unreasonable searches, seizures, &c. ; and also excessive bail, &c.—see arts. 19, 33 ; but whether such searches, &c., are reasonable or not, and whether the bail, &c., demanded was excessive, are questions which must be decided by the court. Opinion of the Justices, 25 N. H. 541, 542 ; *Evans* v. *Foster*, 1 N. H. 377, top of page.

The court will bear in mind that the money assigned to the towns, under the acts of July 2, 1870, and July 15, 1871, is not money which

came from outside, and cost the people of the towns nothing. It is the money taken from the pockets of the people in the several towns, or 'raised by a pledge of their credit, and which, after being thus drained from them, less the interest, expenses, commissions, official pickings, " cartage, truckage, and stealage," is to be returned to them. It is taken from one pocket, and returned to the other. The money assigned to the town was the money of their people, and what of it has been returned is still their money. Names and forms may change, but the substance is indestructible. This act in effect compels the people to give away their money to private individuals with whom they never had any privity, and upon considerations,—if there were any even in name, —entirely past. We say, in view of the special facts of the case, such a law punishes the town for aiding the government with their excess, and is unreasonable, and therefore unconstitutional.

But, further: the case cannot be changed by the fact that bonds (instead of taxation, &c.) were issued under the acts of 1870 and 1871. That must stand as if the state had made a levy, or ordered the town to do so, to pay the plaintiff. No contracts had ever existed. Such legislation assumed to be based entirely on the past. The legislature have no power to use the forms of law to raise money from the people by a " forced loan " to give away to individuals, because, in addition to all other reasons, no court can, upon its conscience, say that such a law is " reasonable." If the legislature cannot raise money from the people to give away, they cannot compel a part of the same people—a town—to do it.

Foster, J. This is an action of assumpsit for money had and received, brought by the plaintiff against the town of Andover, under the statute of July 3, 1872, which provides that " if any town or city has received or shall receive the sum of $100, or part thereof, either in money or bonds, for any person counted as part of the quota of such town or city, who has not received any bounty from such town, city, or place, the sum of money or bonds received shall belong to and be the property of the person so counted, or his legal representatives, and may be recovered of such town or city, in an action of *assumpsit*, as for money had and received."

The legislation upon this subject, which preceded this act, began in 1864. By the act of Aug. 19 (Pamphlet Laws, ch. 4023, sec. 7), towns and cities were authorized to raise money and appropriate the same as a bounty to each person, except those enlisted in or from the insurgent states, who shall be mustered into the military, naval, or marine service of the United States, or shall have been mustered into said service since the call of the president, dated the 14th day of March, 1864, and prior to the passage of the act, to fill the quota of such city, town, or place ;   *   *   such bounty in no case to exceed, in addition to the state bounty, the sum of $100 for each one year's man, $200 for each two years' man, $300 for each three years' man, and in the same proportion for any other term of service."

By the exigencies of the war, men were demanded for the service of the country. The town of Andover was required to fill its quota. This law was passed to enable it and other towns and cities to do so.

The constitutionality of this enabling-act is not apparently questioned, nor is it of doubtful validity. See Cooley's Const. Lim. 234. Under this authority the town of Andover raised money, and thus accumulated a town debt.

To relieve the town, in part, of the burden thus resting upon it — *Sanbornton* v. *Tilton*, 53 N. H. 438–441—the act of 1870 was passed—act of July 2, ch. 12—whereby the state was authorized to issue bonds for the purpose of a limited reimbursement of cities and towns for war expenses incurred by them; and it was provided, that each city, town, &c., shall receive from the state $100 for every man furnished for the military service of the United States, under and after the call of July 2, 1862, and accepted by the United States for the term of three years, and in the same proportion for every man so furnished and accepted for whatever period, the same to be in part payment for any claim upon the state on account of its war debts by any city, town, &c.

The second section of the act provided for a board of commissioners to determine the amount to which each city, town, &c., should be entitled; and the act of July 15, 1871, ch. 3, " in addition to " the act of July 2, 1870, prescribed specific regulations for carrying into practical effect the provisions of the act of 1870.*

Then followed the act of 1872, which has been recited.

It appears from the report of the commissioners, that the plaintiff enlisted in Co. I, 4th regiment of reënlisted veterans, from the town of Andover, December 25, 1863, for three years, and that he was duly accepted by the United States for that time, and was duly allowed accordingly upon the quota of said town, and that the commissioners had allowed to the town the sum of $100, to be paid by the state to the town on account of the plaintiff's enlistment and acceptance as aforesaid.

It appears, also, that there had been an assignment of bonds, according to the report of the commissioners, to each town in the state, and that most of these towns had taken and receipted for their proportion of said bonds, according to said assignment, before June, 1872, and that, on June 1, 1872, the small balance of bonds remaining in the state treasury were reported as a liability of the state, and as due to the several towns which had not taken and receipted for their bonds. The town of Andover had not taken or receipted for their share of the bonds which had been thus assigned to said town, and no bonds or money have actually been taken from the state treasury by the town, but they were held by the state treasurer, ready to be delivered to the

---

* The reports of the state treasurer for June 1, 1872, and June 1, 1873, show that the amount of bonds " prepared," in accordance with the original report of the commissioners, was $2,208,000, of which $2,205,595.44 was actually issued.

town whenever the town would receipt therefor and comply with the provisions of the law.

A preliminary question seems to be, whether the town has, within the meaning of the law, received the money or bonds which have been awarded by the report of the commissioners, but which have never gone into the actual custody of the town.

If the town has not received it—that is, if the state does not hold the money or securities as the agent of the town or in trust for the town—there is the end of this case.

The state does not hold the money or bonds, which the plaintiff seeks to recover, in trust for that individual. It is not pretended that he has any claim other than such as he seeks to enforce, by this action, against the town.

The bonds assigned to the town of Andover by the report of the commissioners, under the act of 1870, are a gratuity given to the town, to relieve them, partially, from the pressure of a grievous burden. Of the legality or constitutionality of the act appropriating such a gift, no party now before the court can well complain. The plaintiff rests his case upon its legality, and the defendants may elect not to receive their proportion or quota of the gift without calling in question the validity of the grant.

If the town of Andover had not, prior to the commencement of this action, August 31, 1872, received the bonds, or their equivalent in money, in fact, or by intendment of law, then, of course, this suit cannot be maintained.

If the town *has* received the bonds or money, when did it get them? Was it before or after the passage of the act of July 3, 1872? If the bonds or money were, within the meaning and intent of the statute, received by the town prior to the act of July 3, 1872, the question will be presented, whether the legislature had the power by virtue of that act to direct and control the disposition of the bonds or money thus received; whether they could constitutionally impose upon the town the obligation to pay a portion of it over to the plaintiff.

If the town had *not* received the bonds or money, within the intent and meaning of the law, prior to the passage of the act of July 3, 1872, then perhaps it might be holden that the town must thereafterward receive the bonds or money, if at all subject to the limitations in the nature of conditions imposed by that act, which might perhaps be regarded as if it had been incorporated by way of condition or proviso in the original act of 1870.

If the town had actually taken this money into its treasury, or if it held it in the hands of its agent, the state treasurer, and so, in fact, had received the money in legal effect before the passage of the act of 1872, it might be contended that the town might appropriate it to any lawful town purposes. The argument would certainly have great force. It would be said, This money was not given us in trust for this plaintiff, or for such as he. The act merely provides for our partial reimbursement for our war expenses.

We do not recognize any obligation to this plaintiff, for reasons perhaps peculiar to his particular claim, if not upon general grounds; nor do we recognize the authority of the legislature to assume the judicial functions of the court and adjudicate the question of our liability to him.

The state gave us this money to do with it as we might please, and imposed no condition, restriction, or limitation upon our disposition of it. The money is ours absolutely, and it cannot be diverted by subsequent legislation. If we have furnished ten men, we are entitled, under the act of 1870, to a thousand dollars, not because these ten men made any contract with or relied on the credit of the state, as they did not, but because we have expended a much greater sum of money for the benefit of the state and the nation, making our own contract with these men. Our claim on the state for reimbursement is independent entirely of the question what kind of contract, no matter how advantageous to us or the reverse, we may have made with these men. Their claim upon us arises out of our contract with them, and not under the law of 1872. The state cannot take the money of the town of Andover and pay it over to Mr. Spaulding.

We should certainly give respectful attention to this line of argument. If public municipal corporations stand like private corporations, the money that had once become theirs could not, probably, be reached in that way; and whether being municipal corporations puts them within the power of the state in this way, is perhaps a serious question,—one, at any rate, not to be avoided.

It is unnecessary to decide whether the funds in the hands of the treasurer are or are not to be regarded as having been received by the town at a date prior to the act of July 3, 1872. The case finds that its proportion or quota of bonds had been assigned to the town prior to June 1, on which day the proportion belonging to the town of Andover was reported, as it has ever since been recognized, as a liability of the state to them; and although the town has not taken it and spent it (as we have little doubt it might lawfully have done, in such a way that these plaintiffs could never have had a lawful claim to recover it), it has never signified its dissent to the acceptance of it; and it may be argued that the state holds it now as the agent or trustee of the town. *Blasdel* v. *Locke*, 52 N. H. 238, 243.

But the town not having in fact taken and appropriated the fund to any specific purpose before the act of 1872, it remains now, as it was then, a specific and designated fund, with an ear-mark upon it, which it may be contended the town holds by its trustee, the state treasurer. And the plaintiff's claim is, that since the very bond which the state gave to the town as a gratuity in 1870 remained intact and recognizable in July, 1873, the legislature had the right to compel the town to pay it over to him.

By the act of 1864 the town was authorized to raise money in order to pay a bounty to soldiers. The town was authorized, but not required, to raise money for this purpose. The town did raise money,

and appropriated it for the purposes designated by the act, thereby assenting to and acquiescing in the authority thus conferred.

Such assent, it has been said, 'is a matter which depends upon the free will of municipal corporations. The assent to the authority thus conferred is an act which they may do or not, as they see fit; and in case they think proper to withhold it, the legislature has no power to compel it. *Hasbrouck* v. *Milwaukee*, 13 Wis. 37.

Whether the legislature has power, against the will of a municipal corporation, to compel its citizens to assume an obligation and to discharge it by taxation, where the obligation is one which does not fall within the ordinary functions or scope of a municipal government, is a very different question, upon which the authorities are not unanimous.

"There are cases," says Judge Cooley, "which deny to the legislature the possession of any such power, and which claim for the municipal organizations the same exemption from compulsory burdens, outside the circle of their ordinary legal duties, that protects the individual citizen. And even where a moral obligation may fairly be said to rest on the municipality, it is denied, in some cases, that the legislature can convert it into a legal demand, and enforce its payment, though it is conceded that the state may authorize the citizens of the municipality to assume the burden and discharge it, if they choose to do so.

"There are other cases, however, which appear to go to the extent of holding that municipal corporations and organizations are so completely under the legislative control, that, whatever the legislature may *permit* them to do, with a view to the general benefit, it may compel them to do, whether their citizens are willing or not."

These considerations are immaterial with reference to the position of these parties under the act of 1864, the validity of which is not called in question, but they become quite important when applied to the act of 1872, by which the town is deprived of the money or bonds acquired under the provisions of the act of 1870, and which the legislature of 1872 has said " shall belong to and be the property of" any person who, having been counted as part of the quota of the town, has not received any bounty from the town, whatever may have been the nature or extent of the obligation or contract under which the person rendered service for the benefit of the town.

A town is a public corporation, deriving its existence and vitality from the act of the legislature. It is a part of the machinery of the state sovereignty which creates it. Over all its civil, political, or governmental powers, the authority of the legislature is supreme and without limitation, unless the limitation is found in some peculiar provision of the constitution of the particular state. Dillon Mun. Corp., sec. 39.

From all which it follows that powers granted may be resumed;

privileges conferred may be countermanded; that which the state has given, it may take away; for all its public functions, powers, and privileges are but subordinate parts of a great political machinery, regulated, controlled, and governed by the head, which is the state. Legislative authority over them extends to a certain if not unlimited control of their funds and revenues; "and the authority is not abridged because the purpose to which the revenue is to be appropriated is specified in the charter; and the ground of the doctrine is, that such corporations have no vested rights in powers conferred upon them for civil, political, or administrative purposes." Dillon Mun. Corp., sec. 35; *Gutzweller* v. *The People,* 14 Ill. 142; *Layton* v. *New Orleans,* 12 La. An. 515.

It has therefore been held that the legislature may repeal the power it had given to cities to grant licenses for the sale of intoxicating liquors, although the money to be derived from the sale of such licenses was directed to be appropriated to the support of paupers within the city. *Gutzweller* v. *The People,* before cited.

The distinction, however, between the making of provisions concerning the public revenues in such manner as in the judgment of the legislature may be requisite for the public good (as by the abolition in this case of a source of revenue derived from a sale of licenses), and the diversion of a revenue or fund enjoyed for municipal purposes, and the bestowal of it upon an individual, is too manifest and important to escape observation.

So, too, where, by an act of the legislature, one city was annexed to and incorporated in another, with a provision that the annexed city, which was less in debt than the other, should be charged only with its own debts; and by a subsequent act it was provided that taxes should be uniform through the entire limits of the enlarged city, the effect of which was to increase the amount of taxes within that portion of the corporation which had been thus annexed to the other, the act authorizing the increased taxation was held to be valid and constitutional. *Layton* v. *New Orleans,* before cited; *Girard* v. *Philadelphia,* 7 Wall. 1; *Montpelier* v. *East Montpelier,* 29 Vt. 12.

It does not necessarily follow, that, because the legislature may control the exercise and manner of enjoyment, to a large extent, of the funds and property of those agencies of the government which it has created, therefore the state may directly intervene and take away the public property or funds, and dispose of them at its discretion. Cooley's Const. Lim. 236.

"According to many courts," says Judge Dillon, "municipal corporations proper (incorporated towns and cities), as ordinarily constituted, possess a double character,—the one *governmental, legislative,* or *public;* the other, in a sense, *proprietary* or *private.*" The distinction and this division of the powers and duties of a municipal corporation into two classes, the one public and the other private, is unsatisfactory to the learned jurist's mind—Dillon Mun. Corp., sec. 29, and note —but he adopts readily enough the deductions flowing from and based upon the distinction.

In its public character, the municipal corporation is subjected to the absolute control of state legislation, subject only to exceptional constitutional limitation. "In its proprietary or private character," says Judge Dillon, "the theory is, that the powers of the legislature are supposed not to be conferred, primarily or chiefly, from considerations connected with the government of the state at large, but for the private advantage of the particular corporation, as a distinct *legal personality;* and as to such powers, and to property acquired thereunder, and contracts made with reference thereto, the corporation is to be regarded as *quoad hoc*, a private corporation, or, at least, not public, in the sense that the power of the legislature over it is omnipotent." Dillon Mun. Corp., sec. 39.

In *Darlington* v. *Mayor, &c., of New York*, 31 N. Y. 164, Judge DENIO declines to recognize the principle of this division of the character of a municipal corporation into two classes—the one public and the other private—and insists upon the legislative right of absolute control of the corporate property. The only point settled by that case was, that an act of the legislature, providing for the compensation, by cities and towns, of parties whose property may be destroyed in consequence of mobs or riots, is constitutional; and the learned judge closes his very luminous and elaborate opinion with the significant remark, that "It is unnecessary to say whether the legislative jurisdiction would extend to diverting the city property to other public use than such as concerns the city or its inhabitants; for this act, if the effect suggested is attributed to the judgment for riot-damages, devotes the property which may be seized on execution to legitimate city purposes, namely, to reimbursing those who have suffered damages on account of the inefficiency of the city authorities to protect private property from the aggressions of a mob."

Whatever may be the grounds of the distinction we have noticed, and whether founded in good reason and logic, and whether essential or not to the promotion of justice, it is, in our minds, fully recognized in the law; and the weight of authority seems to be in favor of the doctrine that, although municipal corporations are not beyond legitimate legislative authority and control, there still may exist rights under contracts and grants, whether legislative or other, which are beyond destruction or impairment by the legislature.

In *Terrett* v. *Taylor*, 9 Cranch 43, 52, Judge STORY thus forcibly and clearly expresses his views of the subject: "In respect to public corporations which exist only for public purposes, such as counties, towns, cities, &c., the legislature may, under proper limitations, have a right to change, modify, enlarge, or restrain them, *securing however the property* for the uses of those for whom and at whose expense it was originally purchased." And in *Pawlet* v. *Clark*, 9 Cranch 292, 336, it was distinctly settled that a legislative grant of glebe lands to a town could not be repealed so as to divest the rights of the grantees.

Chancellor Kent recognizes this doctrine and the authority of these cases. 2 Kent Com. 305.

Grants of property and of franchises, coupled with an interest, to public or political corporations are beyond legislative control, equally as in the case of property of private corporations. STORY, J., in *Dartmouth College* v. *Woodward*, 4 Wheat. 697–700.

Judge Cooley says, — "These cases (from Cranch and Wheaton) draw a distinction between the political rights and privileges conferred on corporations, and which are not vested rights in any sense implying constitutional permanency, and such rights in property as the corporation acquires, and which are protected by the same reasons which shield similar rights in individuals." And from a review of the cases he deduces this rule: "When corporate powers are conferred, there is an implied compact between the state and the corporators, that the property which they are given the capacity to acquire for corporate purposes, under their charter, shall not be taken from them and appropriated to other uses. If the state grants property to the corporation, the grant is an executed contract which cannot be revoked. The rights acquired, either by such grants or by any other legitimate mode in which such a corporation can acquire property, are vested rights, and cannot be taken away." Cooley's Const. Lim. 238.

If land is dedicated as a public square, and accepted as such, a law devoting it to other uses is void, because violating the obligation of contracts. *Warren* v. *Lyons City*, 22 Iowa 351.

By the act of 1870 the state granted to the town of Andover a certain amount of bonds, to be devoted exclusively towards the reimbursement of the expenditures incurred by the town for war purposes during the rebellion, upon the basis that the amount of such bonds should be the aggregate of $100 for every man furnished by said town for the military service of the United States after a specified period of time.

This was an unqualified, unlimited, unincumbered grant, possessing all the incidents of an executed and irrevocable contract. 1 Pars. Con. 235.

A constitutional act of legislation, which is equivalent to a contract, and is perfected, requiring nothing further to be done in order to its entire completion, is a contract executed. Whatever rights are thereby created, a subsequent legislature cannot impair. If the proviso, condition, or limitation, enacted in 1872, had been engrafted upon or made a part of the reimbursement act, it would have been binding, and the town would take the benefits of the act, perhaps, with its burdens. Potter's Dwarris on Statutes 477.

The same rule applies to an obligation created by a constitutional law, which is in the nature of an executory contract, supported by a sufficient consideration.

The law of 1872, declaring a portion of the fund which had been solemnly granted to the town of Andover to belong to and be the property of certain individuals, is invalid, as being contrary to that provision of the Federal constitution, art. 1, sec. 10, which declares that no state shall pass any law impairing the obligation of contracts.

We have reached this result, fully sensible of the duty which requires of the judicial branch of the government great circumspection in passing upon the validity of the acts and doings of the legislature, but mindful also of the paramount authority of the fundamental decrees of the general government, and of the necessity for the preservation and protection of the inestimable principle that has been invaded by the legislation which we are thus constrained to declare null and void.

This result renders unnecessary the consideration of all the other questions of law raised by the case; and it is hardly necessary to remark that our decision does not affect the plaintiff's right to recover any valid claim he may have against the town, founded upon any valid contract he may have made with the town or its agents for services rendered.                                    *Judgment on the verdict.*