# SUPREME COURT,

OF THE

## STATE OF ARKANSAS,

AT THE

## MAY TERM, 1878.

---

### LINDSEY VS. ROTTAKEN.

1. STATUTE CONSTRUED: *Municipal paper.*
   The Act of December 14th, 1875, providing that city warrants, scrip, etc., should be receivable for municipal taxes, was not intended as a curing act. The courts will not, without express language to that effect, infer an intention to cure paper illegally issued.

2. MUNICIPAL POWER: *To issue circulating medium.*
   There was never any statute authorizing the City of Little Rock to issue paper to circulate as money; on the contrary the settled legislative policy has forbidden it. (For a review of the various acts authorizing the issuing of city bonds, see the opinion.)

3. CONTRACTS PROHIBITED BY LAW.
   An act which is forbidden by a statute, or the common law, whether it be *malum in se* or merely *malum prohibitum*, indictable, or only subject to a penalty or forfeiture, cannot be the foundation of a valid contract.

4. BONA FIDE HOLDER OF MUNICIPAL PAPER.
   There can be no innocent holder of paper issued by a municipal corporation without power.

5. STATUTES CONSTRUED: *Acts to prevent circulation of private notes and prescribing liability thereon.*
   Neither the Act of November 25th, 1837, to prevent the circulation of private notes in this State, or the Act of February 14th, 1838, prescribing the liability of the parties drawing, issuing or indorsing such change tickets, etc., embraced municipal corporations.

6. ————: *Same, municipal paper.*

Under the provisions of the Act of December 17th, 1838, prohibiting the issuing of small bills, notes, etc., the officers of any municipal corporation issuing such paper, whose names should be affixed thereto, were rendered individually liable thereon, but no liability was imposed upon the corporation.

. 7. *Bonds and certificates of indebtedness issued by the City of Little Rock as a circulating* medium, in denominations of one, two, five, ten, twenty, fifty and one hundred dollars between the 1st of January, 1868, and the 30th of October, 1874, commonly called "city money," were issued in violation of law and the city is not liable on them, or bound to receive them in payment of taxes.

APPEAL from *Pulaski* Circuit Court.

Hon. J. W. MARTIN, Circuit Judge.

*Collins,* for appellant.

*Rose* and *B. S. Johnson, contra.*

ENGLISH, CH. J.:

On the 28th of January, 1878, Daniel Lindsey, the owner of lots in the city of Little Rock, presented a petition to the Circuit Court of Pulaski County, praying for a *mandamus* against Herman H. Rottaken, sheriff and collector of said county, to compel him to accept what is commonly known as *city money* in payment of the taxes assessed upon the lots of the petitioner in the year 1877, for city general purposes.

The petitioner, after describing his lots, and stating the various taxes charged against them for state, county, city and school purposes for the year 1877, and that a warrant was in the hands of Rottaken for their collection, further alleges:

"That between the 1st day of January, 1868, and the 30th day of October, 1874, the City Council of the City of Little Rock, for the purpose of enabling it to execute its municipal powers, and for the purpose of taking up warrants drawn on the treasurer, which had been given to persons to whom said city

was indebted, issued bonds and certificates of indebtedness of the denominations of one, two, five, ten, twenty, fifty and one hundred dollars; payable to bearer, bearing interest at the rate of eight per cent. per annum, from one to ten years after date, and payable at maturity. That by ordinance or resolution of said City Council, adopted prior to the issue or delivery of said bonds, etc., it was provided that the same should be receivable for all city dues. That for a time said bonds so issued were used in the ordinary business transactions of said city as currency, and to distinguish them from the legal tender notes of the United States they were commonly called 'city money.' That for some time after the said issue of said bonds, the said city continued to receive them in payment of the taxes and dues of said corporation, but after the year 1873, refused so to do."

The petitioner further alleges that the General Assembly, on the 14th day of December, 1875, enacted, among other things, that: "All city warrants, scrip, acceptances, or money, shall be receivable for taxes for city purposes, except for interest tax, and for all debts due the municipal corporation by whom the same were issued, without regard to the time or date of issuance of such warrant, scrip, acceptance, or money, or the purpose for which they were issued." (See Acts of 1875, p. 151.)

That on the 19th of January, 1878, petitioner paid to Rottaken, collector, all the taxes charged upon his lots, except the tax for city general purposes, amounting to $13.50, which he tendered and offered to pay in past due city bonds and certificates of indebtedness commonly known as city money above described, which Rottaken refused to receive, and was threatening to return petitioner's lots delinquent, and cause them to be sold, unless he would pay the tax in other funds.

Petitioner brings said city money into court, and prays that Rottaken be compelled to accept the same, and execute a receipt, etc.

Rottaken filed the following answer:

"For answer to said petition, said defendant says, that the bonds and certificates of indebtedness purporting to be the obligations of the City of Little Rock in the said petition mentioned, were issued as a circulating medium, to be used as a currency or medium of trade in lieu of money, and that they were thus commonly used for a long period of time, the same being engraved on bank note paper, in the form of bank notes, purporting that money would be paid to the bearer thereof, according to the amounts and denominations of the same, contrary to the statute in such case made and provided: wherefore this defendant says that the said supposed evidences of debt are void, and are not receivable for said tax," etc.

The answer further alleges that the supposed Act of 14th December, 1875, was not passed in the manner required by the Constitution; that the bill for the act was so altered on its passage through the two houses of the General Assembly as to change its original purpose, in violation of a prohibition contained in sec. 21, art. v, of the Constitution; and a transcript of the original bill, and the legislative proceedings thereon, as shown by the journals of the two houses, is made an exhibit to the answer.

The petitioner demurred to the answer, the court overruled the demurrer, refused the *mandamus,* and petitioner appealed to this court:

*First*—In the supplemental opinion in *Loftin* v. *Watson, ante,* we held that the Act of 14th December, 1875, was constitutionally passed; that the bill for the act was not so altered on its passage through the two houses as to change its original purpose, within the meaning of sec. 21, art. v, of the Constitution.

*Second*—How far the legislature may, by curing acts, confirm and make valid contracts made by municipal corporations without authority of law, or against legislative prohibition, we do not

find it necessary to decide in this case (see Cooley Con. Lim., p. 379; *Thompson* v. *Lee County*, 3 Wallace U. S., 331; *McMillen* v. *County Judge, etc.*, 6 Iowa, 393; *Hasbrouck* v. *Milwaukee*, 13 Wis., 37). The Act of 14th December, 1875, does not purport, in its title, or in its body, to be a curing act. The object of the act was to require county warrants, etc., to be received in payment of county taxes, etc., and city warrants, acceptances, or money to be received in payment of city taxes, etc., without discrimination as to the date or purpose for which they were issued.

Why the word *money* was used in the act, we do not know, but if the effect of the act is to legalize all paper issued by cities in the form of, and for the purpose of circulating as money, it would also have the effect to legalize and make valid all of the spurious county scrip that was spawned upon the counties by corrupt or reckless officials before the passage of the act, which was certainly not the purpose of the legislature.

In the absence of express words in the statute, we are not at liberty to infer that the legislature intended to cure any paper illegally issued by counties or cities.

But if the paper in question was legally issued by the City of Little Rock, or if the city is legally obliged to redeem it, the appellee would be bound to receive it in payment of the city tax for which it was tendered, regardless of the Act of 14th December, 1875, because the ordinance under which it was issued made it receivable in payment of city taxes. *Woodruff* v. *Trapnall*, 10 How. U. S., 209; *English* v. *Oliver*, 28 Ark., 317; *Wallis et al.* v. *Smith*, 29 Ark., 354; *Loftin* v. *Watson, ante.*

*Third*—Under what particular statute, or charter provision, the city council claimed power to issue the paper in question, is not stated in the petition, nor has it been indicated in the brief oral argument of the counsel for appellant.

It is stated in the petition that the paper, in the form of bonds and certificates of indebtedness, was issued between the 1st of January, 1868, and the 30th of October, 1874.

On the 12th of December, 1866, the legislature passed "An Act to reduce the law incorporating the City of Little Rock, and the several Acts amendatory thereof, into one Act, and to amend the same." This act was the charter of the city from the time of its passage until it was organized under the general law for the incorporation of cities and towns, approved 9th of April, 1869.

By the second clause of sec. 16 of the Act of 12th December, 1866 (Acts of 1866-7, p. 25), power was granted to the city council "To borrow money on the credit of the city, and to issue bonds for the payment of the same."

There is no allegation in the petition that the bonds in question were issued for borrowed money, but it is alleged that the city council for the purpose of enabling it to execute its municipal powers, and for the purpose of taking up warrants drawn on the treasurer, which had been given to persons to whom the city was indebted, issued bonds and certificates of indebtedness, etc.

By sec. 70 of the general incorporation act (Gantt's Digest, sec. 3296), it was provided that, "No council of any municipal corporation shall authorize any loan or appropriation, not predicated on the revenues of the corporation for the current fiscal year, nor shall it authorize any order or appropriation of money when there is not in the city treasury money unappropriated sufficient to pay such appropriation, and any appropriation otherwise made or authorized, shall be held and deemed utterly void and of no effect against said corporation; Provided, that the city council of a city of the first class (to which Little Rock belongs), shall have power to borrow money, not exceeding in amount $500,000, at a rate of interest not exceeding ten per cent. per

Lindsey vs. Rottaken.

annum, at such dates and upon such length of time, not less than fifteen years, as the city may deem proper, for the purchasing of lands or other property within the corporate limits of said city; said lands or other property to be converted to the use of said city for public wharves, levees, squares, parks or market places, or the establishment and maintenance of ferries; and said city council, so borrowing any money for such purpose or purposes, shall be authorized to issue the bonds of said city payable at such time (not earlier than fifteen years), and at such place as the council may deem proper, for the money so borrowed. Before the city council are authorized to borrow money, as herein provided, they shall submit the question to the qualified voters of the city, etc. at an election, etc. And if a majority of the persons voting at such election shall be in favor of making said loan, then said city council may proceed so to do in accordance with the provisions of this act, and not otherwise."

Under this section of the act bonds could not be issued at all unless voted by the electors of the city, and then to run not less than fifteen years.

The bonds described in the petition were made payable from one to ten years after date, and it is not pretended that they were voted by the electors of the city.

Sec. 72 of the act (Gantt's Dig., sec. 3298), provides that "The city or town council of any city or town, for the purpose of extending the time of payment of any indebtedness heretofore incurred, and which, from the limit of taxation, such city or town is unable to pay at its maturity, shall have the power to issue bonds of such city or town, or borrow money so as to change, but not increase the indebtedness, in such amounts, not less than fifty dollars, and for such length of time and at such rate of interest, not more than ten per cent. per annum, as such city or town council may deem proper; and when such bonds shall have

been issued, a tax shall be assessed, etc., to provide a sinking fund for their final redemption, etc."

Under this section bonds could be issued only for the purpose of extending the time of payment of indebtedness incurred before the passage of the act (9th of April, 1869), and in sums not less than fifty dollars.

The bonds, etc., in question were issued in denominations of one, two, five, ten, twenty, fifty and one hundred dollars, and it is not alleged that they were issued for the purpose indicated in the section of the act quoted.

There are no other provisions of the Acts of 12th December, 1866, and 9th of April, 1869, authorizing the issuance of bonds; and certainly none that authorized the council of the City of Little Rock to issue bonds, or certificates of indebtedness, for the purpose of circulation as currency.

The answer alleges, and the demurrer admits, that the bonds and certificates of indebtedness, purporting to be the obligations of the City of Little Rock, mentioned in the petition, were engraved on bank note paper, in the form of bank notes, and were issued as a circulating medium, to be used as a currency or medium of trade in lieu of money, and that they were thus commonly used for a long space of time, etc.

The petition alleges that they were used in the ordinary business transactions of the city as currency, and to distinguish them from the legal tender notes of the United States, they were commonly called "city money."

The petition falls short of averring that they were issued for the purpose of circulation as currency, but the answer supplies the omission, the demurrer admits it, and so the pleaders are in agreement upon the facts.

There never was any statute authorizing the City of Little Rock to issue paper to circulate as money; on the contrary the

public policy as indicated by the legislation, etc., has been against it.

By the Constitution of 1836, the legislature was authorized to incorporate one State Bank, with branches, and one other banking institution. Title Establishment of Banks.

Banks followed and failed, leaving the State a legacy in the form of outstanding bonds, sold and hypothecated to procure banking capital.

The failure, and the evil entailed, taught the people of the State a lesson, and on the 17th of November, 1846, an amendment to the Constitution was ratified, declaring that: " No bank or banking institution shall be hereafter incorporated or established in this State." English's Dig., p. 71.

In the meantime, before the amendment, the legislature passed the Act of 17th December, 1838, entitled, "An Act to prohibit the issuing of small bills, notes, or change tickets;" the first section of which provided that from and after the passage of the act, it should not be lawful for any city, town or corporation, whatever, within the State, to issue small bills or notes, commonly denominated change tickets, or shin-plasters, unless specially authorized by law. Acts of 1838, p. 13.

On the 15th of December, 1852, the legislature incorporated the " Cincinnati and Little Rock Slate Company," for the purpose of developing the resources of the State, as recited in the preamble to the act; and by sec. 8, it was enacted " That for the purpose of facilitating the operations of the said company, they shall have power to draw and sell drafts or bills of exchange in such sums, or amounts, as they might think proper, on the different cities to which they may ship their merchandize." Acts of 1852, p. 25-6.

This enterprising company attempted to develope the resources of the State, not by getting out slate, but by issuing small drafts

and bills of exchange, and attempting to convert them into a circulating medium.

On *quo warranto*, this court held that it was not the intention of the legislature, by the 8th section of the charter, to confer any banking privileges upon the company, or to authorize them to issue bills to be used as a circulating medium, and that if such had been the intention of the legislature, the grant would have been void under the amendment to the Constitution, ratified 17th November, 1846. *Smith* v. *The State*, 21 Ark., 294. Of course this State money, issued in violation of law, and based on nothing, shared the fate of all such paper.

Before the issuance of the paper in question, a number of acts were passed, some of which will be particularly noticed hereafter, showing it to have been the settled policy of the State to prohibit corporations and individuals from issuing small notes to circulate as currency. See Rev. Stat., ch. 24, Change Tickets; Ib., ch. 119, Private Notes; English's Dig., ch. 29, Change Ticket; Acts of 1854-5, p. 107; Acts of 1858-9, p. 138; Gould's Dig., ch. 20, Change Tickets and Bank Notes; Gantt's Dig., ch. 19, Change Tickets and Bank Notes; Acts of 1846, p. 111.

The legislature intended, as remarked by Justice Lacy, *Yeates et al.* v. *Williams*, 5 Ark., 686, to prevent by every possible means the utterance and circulation of such currency, and its policy was just and wise.

The Constitution of 1868, provided for the incorporation of banks, to issue bills as currency, based on State bonds deposited with the Auditor. Sec. 50, art. v. But no banks were chartered. Congress had monopolized the business of manufacturing paper money. Treasury notes were issued and change supplied in the form of fractional currency; and more than a thousand national banks were chartered (whether under the commerce or war power it is not our province to decide), to issue bills secured

Lindsey vs. Rottaken.

by government bonds. There was no necessity for the State, or its corporations, to engage in banking. .

The paper in question was issued by the city council between the 1st of January, 1868, it seems, and the 30th of October, 1874, when the Constitution of 1868 was abrogated. As a matter of public history that may be called the paper period. There was a prevalent mania for manufacturing bonds and scrip by millions, State bonds and scrip, county bonds and scrip, city bonds and scrip; and petty school corporations, following evil examples, issued scrip so excessively in some instances, that a hundred dollars of the paper would not purchase a school master a pair of breeches, and the issues of some of the larger corporations proved to be as worthless.

The council of Little Rock was infected with the general mania, and flooded the community with the issues in question, which the petition informs us were commonly called "city money," to distinguish them from the legal tender notes of the United States.

It is also a matter of public history, that the issuance of this so-called money, commenced under the administration of an honorable mayor, who derived his appointment from a military commander, and he no doubt honestly concluded, that if the power to issue the paper, was not to be found in the charter of the city, it might be done under the war power.

It appears from the first case of *Jones* v. *City of Little Rock*, 25 Ark., 284, that Jones, a tax payer of the city, filed an original bill in this court, praying an injunction to restrain the mayor and aldermen from issuing notes or bonds of the city to circulate as money, and the injunction was refused for want of jurisdiction.

It appears from the second case of *Jones* v. *City of Little Rock*, 25 Ark., 301, that Jones, a large property owner, in behalf of himself and all other tax payers of the city, filed a bill in the

Pulaski Chancery Court, alleging that the mayor and aldermen had procured plates, engraved for notes or bonds, which they were about to issue upon the credit of the city, and which were designed to circulate as currency or money; that for more than a year past, such bonds or notes, had been issued by the city, under the authority of the council, and had circulated as money, being a common medium of exchange within the city; that the council had a large amount of such notes or bonds, of denominations under thirty dollars, which they would put in circulation, if not restrained, and that no vote of the people had been taken authorizing the issuing of such bonds; and that the council were about to issue and circulate the same on their own motion; and praying that they might be enjoined.

That the chancellor granted a temporary restraining order, until the application for injunction could be heard in court, and on such hearing the court dissolved the restraining order, and refused to grant an injunction until the cause was finally heard.

Jones then made an application to this court (December Term, 1868) for mandamus to compel the chancellor to reinstate and continue the restraining order until the final hearing of the cause.

We understand from the opinion of Justice Gregg, that the court refused the mandamus on two grounds: *First*, that Jones showed no such personal interest in the matter as to entitle him to an injunction; and *second*, that it was not only illegal, but criminal in the officers of the corporation to issue the paper, and that a Court of Chancery could not enjoin the commission of an act not only void, but criminal.

The city council, disregarding the decision of the Supreme Court, that it was illegal and criminal to issue the paper, persisted in its issuance, and received it for taxes, etc., it is alleged, until after the year 1873, when it was refused.

In the year 1875, the city attempted to fund, by bonding, outstanding bonds and certificate of indebtedness issued upon bank-note paper, for the purpose of circulating as money, and at the suit of Wm. and James Vance, citizens of Texas, but who owned and paid taxes on real estate in the city, the funding was restrained by injunction from the Circuit Court of the United States for the Eastern District of Arkansas, on the ground as we understand, that the paper which the city was proceeding so to fund, was illegally issued.

And in the case of *Merchants' National Bank* v. *The City of Little Rock*, recently decided in the same court, Justice Dillon charged the jury (the District Judge concurring): "That the form and appearance of the city bonds on bank-note paper, engraved with vignettes, in the similitude of greenbacks or bank bills, and of the denomination of one dollar, two dollars, five dollars, ten dollars, twenty dollars, fifty dollars and one hundred dollars, in connection with the undisputed fact that they did form for a considerable period a local circulating medium, and were used by the city and community in lieu of currency, establishes that the said bonds were issued for the purpose of circulating as money, and in violation of the statutes of the State in that regard."

We conclude this feature of the case by affirming that the paper in question was not only issued without authority of law, but in violation of the statutes and policy of the State.

*Fourth*—Any act which is forbidden, either by the common or the statutory law—whether it is *malum in se*, or merely *malum prohibitum*; indictable, or only subject to a penalty or forfeiture; or however otherwise prohibited by a statute or the common law, cannot be the foundation of a valid contract; nor can anything auxilliary to, or promotive of such act. Bishop on Contracts, sec. 458.

So a contract invading any one of the other interests which the law cherishes, though the thing to be done or promoted is not indictable, and not prohibited by any statute, termed a contract against public policy (or sound policy) is likewise void. Ib., sec. 460.

A note made on Sunday in violation of a statute is void. *Tucker* v. *West et al.*, 29 Ark., 386.

In *Craig et al.* v. *Missouri*, 4 Peters, 436, Chief Justice Marshall said, it has been long settled that a promise made in consideration of an act which is forbidden by law is void.

In *Thomas* v. *City of Richmond*, 12 Wallace, 349, assumpsit was brought against the City of Richmond, upon notes issued by the city to circulate as currency. Mr. Justice Bradley, delivering the opinion of the Supreme Court of the United States (on error to the Circuit Court of the District of Virginia) said: "The court finds as a fact that the notes upon which the present action is brought were issued to circulate as currency; and, as matter of law, that this was in violation of the law and policy of Virginia. * * *

"The issue of notes as a common currency, or circulating medium, is guarded with much jealousy by all governments as touching one of its most valuable prerogatives, and as deeply affecting the common good of the people. Almost every state has stringent laws on the subject, and it may be said to be against the public policy of the country to allow individuals or corporations to exercise this prerogative without express legislative sanction. The State of Virginia, like all the other States, had a law of this kind in operation at the time the notes in question were issued. The issue of the notes in question was clearly in violation of this law. * * *

"But the charter of the City of Richmond has been referred to for the purpose of showing that the common council had

power to issue such notes. One of the grants of power relied on is, that the city is made a corporation with power to contract and be contracted with, and generally with 'all the rights, franchises, capacities, and powers appertaining to municipal corporations.' In a community in which it is against public policy, as well as express law, for any person or body corporate to issue small bills to circulate as currency, it is certainly not one of the implied powers of a municipal corporation to issue such bills. Such a corporation 'can exercise no power which is not, in express terms, or by fair implication, conferred upon it.' Another clause of the charter to which reference has been made authorizes the council to borrow money and to issue the bonds or certificates of the city therefor. But this cannot be seriously urged as conferring the right to issue such bills as those now in suit. Such city securities as those authorized by the charter are totally different from bills issued and used as a currency or circulating medium. The distinction is understood and recognized by the whole community. A power to execute and issue the one class cannot, without doing violence to language, be deemed to include power to issue the other. We do not hesitate to say, therefore, that the common council of Richmond had no power or authority to issue such paper, and that they could not bind the city thereby." See also *Davidson* v. *Lanier*, 4 Wallace, 447; *Brown* v. *Tarkington*, 3 Ib., 377; *Root* v. *Godard*, 3 McLean, 102; *Weed et al.* v. *Snow*, Ib., 265.

In *Dively* v. *City of Cedar Falls*, 21 Iowa, 569, held that notes issued by the city for the purpose of being used and circulated as money in violation of the statute, were void and could not be the basis of recovery. See also *Attorney General* v. *Life and Fire Insurance Co.*, 9 Paige, 476; *Smith* v. *Strong*, 2 Hill, 241; *McCullough* v. *Moss*, 5 Denio, 567.

In *Wheeler* v. *Russell*, 17 Mass., 281, Parker, Ch. J., said: "No principle of law is better settled than that no action will lie upon a contract made in violation of a statute, or of a principle of the common law.. See also *Williams* v. *Yeates et al.*, 5 Ark., 684.

*Fifth*—It was insisted in the argument by counsel for appellant that he had nothing to do with the issuance of the paper in question by the city council, and was therefore an innocent holder.

It is sufficient to say of this, that there can be no innocent holder of paper issued by a municipal corporation without power or in violation of law. *Township of East Oakland* v. *Skinner*, 94 U. S. Rep. (4 Otto), 255; *Town of South Ottawa* v. *Perkins*, Ib., 261; *Marsh* v. *Fulton County*, 10 Wallace, 683; The Floyd Acceptances, 7 Wallace, 676; *Dively* v. *City of Cedar Falls*, 21 Iowa, 569; Dillon on Municipal Bonds, sec. 7; *Root* v. *Godard*, 3 McLean, 102.

The reason of the rule is that such corporations are enacted by and derive all their powers from public law, and persons dealing with them, or taking their paper, are obliged, at their peril, to ascertain the extent of their contracting powers, and limitations upon them.

*Sixth*—We come now to the final, and really the only perplexing question in the cause, and that is, has the legislature provided that the city shall be liable upon, and shall redeem the paper in question, notwithstanding it was issued in violation of law, and public policy, and under a general principle, is void?

As a matter of public history, it may be stated that the paper continued to circulate as currency in the ordinary transactions of the community until the fall of 1873, when the banks refused to receive it, and it was thereby discredited among the mercantile classes and fell below par. Finally after the city refused to receive it for taxes, and after the Circuit Court of the United

States enjoined the city from funding it, it sunk down to a nominal value, and perished in the hands of its unfortunate holders, many of whom were doubtless illy able to bear the loss.

How much of it is still outstanding, and whether it remains in the hands of the many who sustained the loss of its depreciation, or has been accumulated in the hands of a few, we do not know, nor is it material to the settlement of the legal question before us. As a currency, it has but repeated the history of all paper illegally issued to circulate as money.

If the city is legally obliged to redeem the paper, the means of its redemption must be drawn from the tax-payers, and they must be punished for the illegal conduct of the officers of the city in issuing it.

In Pennsylvania the very act that prohibited corporations from issuing small bills and notes to circulate as currency, declared that they should not be void by reason of the statute, but that the corporation should be liable upon them. The Supreme Court of that State, in *Allegheny City* v. *McClurkan & Co.*, 14 Penn. State, 84, said: "The provisions of the statute are very plain and intelligible. They announce two propositions: *First* —You violate the law and incur the penalty if you issue small notes under five dollars, and put them in circulation currently; but if you will violate the law, and issue them and incur the penalty, you shall pay the holder the uttermost cent you engage to pay on their face, and in addition, if he is compelled to bring suit, you shall pay interest at the rate of 20 per cent. per annum."

Our legislature has in substance and effect said about the same to persons who may issue paper to circulate as currency, but it has in no statute expressly relating to municipal corporations employed such language.

The first statute passed on the subject was entitled "An Act to prevent the circulation of private notes in this State," approved November 25th, 1837, and was made to take effect from and after the 1st of March, 1838 (Rev. Stat., sec. 5, chap. 24), and is contained in ch. 119, title "Private Notes," Revised Statutes.

The act is as follows:

· Section 1.   No person or persons unauthorized by law shall intentionally create or put in circulation, as a circulating medium, any note, bill, bond, check or ticket, purporting that any money or bank notes will be paid to the receiver, holder or bearer, or that it will be received in payment of debts or to be used as a currency or medium of trade in lieu of money.

Sec. 2.   If any person shall issue, put into circulation, sign, countersign or indorse any such note, bill, bond, check or ticket, he, she or they so offending, shall be indicted, and being thereof convicted shall be fined not less than fifty, nor more than three hundred dollars, and be imprisoned not exceeding three months.

Sec. 3.   If any person or company vend, pass, receive or offer in payment any such note, bill, bond, check or ticket, he, she or they, so offending, shall forfeit the sum of fifty dollars, to be recovered by action of debt with cost to the use of any person who will sue for the same before any justice of the peace of the county in which the party offending be found.

Sec. 4.   The preceding section shall not affect any note issued by any bank authorized by law in the United States, except notes for a less sum than five dollars.

If the scope of this act be limited to the purpose expressed in its title " to prevent the circulation of private notes," it might well be held to embrace paper issued or put into circulation by individuals, firms, companies, and even private corporations, but paper issued by a public municipal corporation could not, with any regard to the meaning of language, be held to be included in the words " private notes."

But if it be said that the word "person," as used in the act, embraces municipal corporations, the punishment prescribed by the second section for creating or putting into circulation such paper, must necessarily fall on the officers of the corporation, because a corporation is an ideal being, and cannot be indicted, fined and imprisoned.

Sec. 21, ch. 129, Revised Statutes, provides that the word "person," in any statute, shall be deemed to include females as well as males, and bodies corporate as well as individuals, but it is by no means a rule without exceptions that the word embraces municipal corporations. *Boone County* v. *Keck*, 31 Ark., 387.

The second act on the subject was approved and in force February 14th, 1838, and forms ch. 24 of the Revised Statutes, title Change Tickets, and is as follows:

Section 1. The holder or owner of any change ticket, bill or small note, issued for the purpose of change or otherwise, shall have the right to sue the drawer, issuer, or endorser, of such change ticket or tickets, bill or bills, or small note or notes, before any justice of the peace in this State.

Sec. 2. The justice of the peace before whom any suit may be brought, under the provisions of this act, shall, in all cases, when he is satisfied that the defendant in such suit did draw, issue, sign, or endorse the change ticket, bill or small note sued on, and that the same is not paid, forthwith give judgment for the plaintiff for the amount of such change ticket, bill or note sued on, and shall forthwith grant the plaintiff an execution on the judgment, if the plaintiff require the execution.

Sec. 3. It shall not be any bar to any plaintiff obtaining a judgment on any change ticket, bill or small note, on account of any conditions specified or set forth in any change ticket bill or note, sued on, that payment will be made when the sum of five dollars is presented, but the justice shall give judgment for the amount of the change ticket, bill or small note, sued on.

Sec. 4. The justice before whom any judgment may be obtained, by the provisions of this act, shall not grant or allow any appeal or stay of execution, nor shall the defendant be permitted or allowed to have any stay of execution, appeal, certiorari, writ of error, or injunction, but shall abide the judgment of the justice.

Sec. 5. The act passed at this session of the General Assembly, entitled, "An Act to prevent the circulation of private notes in this State," approved November twenty-fifth, eighteen hundred and thirty-seven, shall take effect and be in force, from and after the first day of March next. (Approved and in force, February 14th, 1838.)

If the City of Little Rock is liable upon the paper in question, it must be liable under the provisions of this act, for it is not pretended that there is any other act upon which the liability of the corporation can be predicated.

Municipal corporations are certainly not expressly included in any of the provisions of the act.

It is equally as clear that they are not impliedly included in the use of the term " person," for it is a remarkable fact that the word person is nowhere used in the act.

Moreover, the second section of the act provides, without any exception, that the justice of the peace shall forthwith grant the plaintiff an execution on the judgment recovered upon the ticket, bill, or note; yet sec. 15, ch. 33, of the Revised Statutes, title Corporations, provides that no execution shall issue against a municipal corporation. (Approved, March 3d, 1838.)

We are satisfied that in the enactment of 14th of February, 1838, copied above, municipal corporations were not in the minds of the law-makers; and that they are not included in the provisions of the act.

Lindsey vs. Rottaken.

Hence it was found necessary to pass the Act of 17th December, 1838, entitled "An Act to prohibit the issuing of small bills, notes, or change tickets;" (Acts of 1838, p. 13,) which is as follows:

Be it enacted, etc., That, from and after the passage of this act, it shall not be lawful for any city, town, or corporation, whatever, within the State of Arkansas, to issue small bills or notes, commonly denominated change tickets or shin-plasters, unless specially authorized by law.

Sec. 2. That all persons, officers of such city, town, or corporation, or others whose names shall be affixed to any such bills, notes, change tickets, or shin-plasters, issued in violation of this act, shall be individually responsible for the same.

Sec. 3. That the holders of any such bill, note, change ticket or shin-plaster, issued in violation of this act, may sue for, and recover in gold or silver, the amount for which they purport to be payable, from the individuals whose names shall be affixed thereto, before any justice of the peace residing in the city, town, or county, in which the same may have been issued; and the decision of the justice, in all such cases, shall be final.

Sec. 4. That the provisions of this act shall be construed to extend to all small bills, notes, change tickets, or shin-plasters, heretofore issued by any city, town, or corporation, unless the same be redeemed by the first day of May, eighteen hundred and thirty-nine.

Persons whose memories go back so far, may remember that the word shin-plaster was a vulgar term applied at the time and before the passage of this act, to paper issued by individuals, firms, companies and corporations, without the privilege of banking, to circulate as currency, and especially for making change, which was a prevailing, and proved to be a pernicious evil.

To sum up the legislation on the subject, the legislature said to all private persons, whether acting individually, or in firms, or companies, you must not issue notes, bills, etc., to circulates as currency, but if you will issue them, you shall be subject not only to indictment, fine and imprisonment, but shall be liable on the paper.

The legislature also said to corporations, in language equally as emphatic, you shall not issue such paper, but if you will, all officers of such corporation, and others whose names shall be affixed to such paper, shall be individually responsible for the same; and possibly (under the act of November 25th, 1837), subject to indictment, fine and imprisonment.

This legislation was eminently just, for the officers of a corporation who issue forbidden paper in violation of law, should be liable upon it, and not the stockholders or tax-payers, who may be blameless in the matter.

Dudley E. Jones, in behalf of himself and all other tax-payers made ineffectual appeals to the courts to stop the officers of the City of Little Rock from issuing the paper in question, and yet if the city is liable upon the paper, he and the other tax-payers of the city must suffer the consequence of their illegal acts.

Mr. Justice Gregg, in the second case of *Jones* v. *City of Little Rock*, 25 Ark., 306, said: " If such (meaning the bonds, etc., in question), are issued without authority of law, then the city is not bound to redeem them. If issued in violation of a positive statute, they are void, and the taxable property of the citizens cannot be held liable for their redemption."

It is insisted that this part of the opinion is *obiter dictum*, and that may be true, but we hold that it correctly announced the law of this case; and it is unfortunate for the community that the opinion was disregarded by the officers of the city; for any

temporary good that may have come of the issuance of such paper (if indeed there was any), has been largely overbalanced by the evils and losses flowing from it, as has invariably happened with all such " shin-plaster" enterprises.

We have not overlooked the expressions of Judge Lacy in *Van Horne* v. *The State*, 5 Ark., 349.

Trowbridge, (who had been Mayor of Little Rock), Whitmore and Van Horne, were indicted for forgery in the Circuit Court of Pulaski County, the indictment charging that they "feloniously did forge and counterfeit the false resemblance, and imitation of certain notes and instruments which circulated, by usage as currency, etc., purporting to be of the corporation of the City of Little Rock," etc., etc.,

Van Horne, was convicted upon the indictment and sentenced to the Penitentiary, and brought error.

It was argued for the prisoner, that the city had no power under its charter to emit a paper currency; that the issuance of change tickets and small notes was expressly forbidden by statute, that such emissons were void, and hence it was no offense to counterfeit then.

The Act of December, 17th 1838, modifying the penal code to correspond with the establishment of a Penitentiary, (Acts of 1838 p. 121), which was in force when this case was tried, provided that; "whoever shall be guilty of forgery, counterfeiting, etc., etc., the counterfeit resemblance or imitation of any bank bill, or any note, check, or draft, or bill of exchange, or instrument, which circulate as currency of any corporation, company, or person, or purporting to be of any corporation, company or person, that really exists or may exist, or that does not exist, etc., with intent to deceive and defraud, shall be imprisoned," etc.

Judge Lacy, who delivered the opinion of the Court, held that the prisoner was properly convicted for counterfeiting paper

which puported to be issued by the corporation of Little Rock, whether the city was liable upon the paper or not, or indeed whether the corporation in fact existed.

But he went further, and undertook to show that the corporation was liable upon such paper, though issued by it contrary to law.

It will be observed, on a careful reading of the opinion, that the learned Judge did not notice the provisions of the Act of December 17th, 1838, which expressly forbids corporation from issuing such paper, and makes their officers, or others whose names are affixed to the paper liable upon it.

He makes the word "person" and "company," as used in the Act of November 25th, 1837, include corporation, but that act, as we have above shown, makes neither person nor corporation liable upon the paper, but makes it criminal to issue it, and penal to vend, pass, receive, or offer it in payment, etc.

He also seems to have overlooked the fact that the word "person" was not at all used in the Act of February 14th, 1838.

That the judgement of the court was right in Van Horne's case; that he was guilty of forgery, we do not question, but with all due respect for the learning and memory of Judge Lacy, we think he was in error in saying that the City of Little Rock, would be liable upon paper issued by its officers in violation of law for the purpose of circulating as money, though the officers whose names may be affixed to such paper are liable.

The same learned judge delivered the opinion of the court in *Yeates et al* v. *Williams*, 5 Ark., 684.

Williams, assignee of Williams & Co., sued Yeates & Butts, on a writing obligatory, executed by Anderson J. Greer as principal, and defendants as sureties. The defendants pleaded in bar, that they executed the bond as securities of Greer, to the plaintiff's assignee, and that the consideration therefor " was certain

tickets, notes or checks, purporting that Arkansas bank notes would be paid to the receiver, holder or bearer, which said tickets, notes or checks being intended to be used as a currency or medium of trade in lieu of money, the said checks, tickets or notes being not authorized so to be put in circulation, contrary to the statute in such case made and provided," etc.

The court below sustained a demurrer to the plea, and defendants appealed.

Whether the notes or tickets for which the bond was given were issued by an individual or corporation does not appear. If issued by the former, he was liable upon them, if by the latter, the officers, or others, whose names were affixed, were liable upon them. Yet this court held that the bond sued on was void, because executed for paper issued and passed in violation of law.

Many years ago, Phillip L. Anthony, proprietor of the Anthony House, embarked in the change ticket business, and issued paper redeemable in hotel fare, or Arkansas money. Judgment was recovered against him before a justice of the peace on one of his tickets. Passing over the Circuit Court, he procured the proceedings of the justice to be brought before this court, and reviewed on *certiorari*; Anthony *ex parte*, 5 Ark., 358.

Chief Justice Ringo, who delivered the opinion of the court, after making a brief summary of the three acts relating to the subject, which we have copied above, said: "According to our understanding of these statutory provisions, they embrace only such instruments as purport to be for five dollars, or a sum under five dollars, and were, by the maker, drawer, issuer, indorser, or other person affixing his name thereto, designed to circulate from hand to hand as currency or change," etc.

No doubt the issuance of small bills to circulate as currency was the prevailing evil at the time the acts were passed, and the mischief which the legislature designed to suppress. But it is

not to be inferred from expressions contained in any of the acts, that the legislature meant to tolerate the issuance of large bills to circulate as currency, by unauthorized persons or corporations. This might enhance the evil, if they could be imposed upon communities.

Section 3 of the Act of 25th of November, 1837, makes it penal to vend, pass, receive or offer, etc., any note, bill, bond, check, or ticket issued for circulation, etc., but sec. 4 exempts from this prohibition any note issued by any bank in the United States, authorized by law to issue bills, except notes for a less sum than five dollars.

The object of making this exception was to prevent the circulation in the state of bank bills of a less denomination than $5, because the use of such paper tended to displace coin. Such was also the purpose of the Act of January 8th, 1855, and of the Act of February 8th, 1859, which latter act extended the prohibition to bills of a denomination less than $20 after the 4th of July, 1860.

The officers of the City of Little Rock issued the bonds, etc., in question in denominations of one, two, five, ten, twenty, fifty and one hundred dollars, all of which were designed to circulate as currency.

If the larger bills were not within the letter, they were within the spirit of the forbidding acts, and Judges Dillon and Caldwell correctly charged the jury in the case of *The Merchants' National Bank* v. *The City of Little Rock,* that it was illegal to issue them.

Moreover, it was well said by Justice Bradley, in *Thomas* v. *City of Richmond, supra,* that: "The issue of notes as a common currency, or circulating medium, is guarded with much jealousy by all governments as touching one of its most valuable prerogatives, and as deeply affecting the common good of the

people \* \* \* \* and it may be said to be against the public policy to allow individuals or corporations to exercise this prerogative without express legislative sanction."

We said above that contracts invading public policy, as well as such as are forbidden by common or statute law, were void.

After a careful consideration of the whole subject, our conclusion is that the city is not liable upon the so-called "City Money" in question, and that the appellee was not legally obliged to accept it in payment of the city tax for which it was tendered by appellant; and therefore the judgment of the court below must be affirmed.